No. 23-2275

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

STEVEN ROBERT BROWN, et al.,

Plaintiffs-Appellees,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Northern District of West Virginia

———————————

**BRIEF FOR APPELLANTS**

———————————

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
  *General*

WILLIAM J. IHLENFELD, II
  *United States Attorney*

MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT
STEVEN H. HAZEL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7217*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2498*

**TABLE OF CONTENTS**

**Page**

STATEMENT OF JURISDICTION ................................................................... 1

STATEMENT OF THE ISSUE ......................................................................... 1

PERTINENT STATUTES AND REGULATIONS......................................... 1

STATEMENT OF THE CASE .......................................................................... 1

    A.    Statutory and Regulatory Background ........................................... 1

    B.    Prior Proceedings .......................................................................... 5

SUMMARY OF ARGUMENT ........................................................................ 6

STANDARD OF REVIEW............................................................................... 8

ARGUMENT ..................................................................................................... 8

The Second Amendment Allows Congress To Prohibit The Commercial Sale
    of Handguns To Individuals Under The Age Of 21 ............................................ 8

CONCLUSION .............................................................................................. 25

REQUEST FOR ORAL ARGUMENT........................................................... 25

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Andrews v. State,*
   50 Tenn. 165 (1871) ................................................................ 16

*Brown v. Entertainment Merchs. Ass'n,*
   564 U.S. 786 (2011) ............................................................... 12

*Carolina Youth Action Project; Ford ex rel. D.S. v. Wilson,*
   60 F.4th 770 (4th Cir. 2023) ................................................. 8

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) ....................................... 6, 8, 9, 10, 13, 15, 16, 17, 20, 21

*Hirschfeld v. ATF,*
   5 F.4th 407 (4th Cir. 2021), *as amended*
   (July 15, 2021), *vacated*, 14 F.4th 322 (4th Cir. 2021) ................................. 23

*Lara v. Commissioner Pennsylvania State Police,*
   No. 21-1832, slip op. (3d Cir. Jan. 18, 2024) ............................................ 17

*McDonald v. City of Chicago,*
   561 U.S. 742 (2010) ............................................................... 6, 10

*Monsanto Co. v. Geertson Seed Farms,*
   561 U.S. 139 (2010) ............................................................... 23

*Naranjo, In re,*
   768 F.3d 332 (4th Cir. 2014) ................................................. 23

*National Rifle Ass'n of Am., Inc. v. ATF,*
   700 F.3d 185 (5th Cir. 2012) ....................................... 7, 8, 9, 11, 16-17, 18, 19

*National Rifle Ass'n v. Bondi,*
   61 F.4th 1317 (11th Cir.), *opinion vacated upon granting of rehearing en banc,*
   72 F.4th 1346 (11th Cir. 2023) ......................................... 14, 16, 20

*New York State Rifle & Pistol Ass'n v. Bruen,*
   597 U.S. 1 (2022) ....................................... 5-6, 7, 9, 10, 13, 16, 17, 21, 23

*Opinion of the Justices, In re,*
   39 Mass. (22 Pick) 571 (1838) ............................................. 18

*Roper v. Simmons*,
    543 U.S. 551 (2005) ................................................................ 22, 23

*State v. Callicutt*,
    69 Tenn. 714 (1878) ................................................................ 15, 16

*Wudi Indus. (Shanghai) Co. v. Wong*,
    70 F.4th 183 (4th Cir. 2023) ........................................................ 24

**Constitutions:**

U.S. Const. amend. II .................................................................... 9

N.C. Const. of 1868, art. XII, § 1 ................................................ 19

**Statutes:**

Act of Mar. 26, 1790, ch. 3, 1 Stat. 103, 103-04.......................... 10

Act of Jan. 29, 1795, ch. 20, 1 Stat. 414, 414-15.......................... 10

Bipartisan Safer Communities Act,
    Pub. L. No. 117-159, div. A, tit. II, § 12001(a)(1)(B)(i)(III),
    136 Stat. 1313, 1323 (2022)
    (codified as amended at 18 U.S.C. § 922(t)(1)(C))......................... 5

Gun Control Act of 1968,
    Pub. L. No. 90-618, tit. I, 82 Stat. 1213:
        § 101, 82 Stat. at 1213-14........................................................ 3
        18 U.S.C. § 922(a)(1) ............................................................. 4
        18 U.S.C. § 922(a)(21)(C) ...................................................... 4
        18 U.S.C. § 922(b)(1) .................................................. 1, 6, 8, 17
        18 U.S.C. § 922(c) ................................................................. 6
        18 U.S.C. § 922(c)(1) .................................................. 1, 4, 8, 17
        18 U.S.C. § 926 .................................................................... 5

Militia Act § 1, 1 Stat. 271, 271 (1792)...................................... 18

Omnibus Crime Control and Safe Streets Act of 1968,
    Pub. L. No. 90-351, tit. IV, 82 Stat. 197:
        § 901(a)(2), 82 Stat. at 225....................................................... 2
        § 901(a)(3), 82 Stat. at 225....................................................... 3
        § 901(a)(6), 82 Stat. at 225-26.............................................. 2, 3

Violent Crime Control and Law Enforcement Act of 1994,
  Pub. L. No. 103-322, tit. XI, subtitle B, § 110201(a),
  108 Stat. 1796, 2010-11 ................................................................ 5

28 U.S.C. § 1291 ........................................................................... 1

28 U.S.C. § 1331 ........................................................................... 1

**Regulation:**

27 C.F.R. § 478.99(b) ................................................................... 5

**Legislative Materials:**

114 Cong. Rec. 12,309 (1968) ...................................................... 2

*Federal Firearms Act: Hearings Before the Subcomm. to Investigate
  Juvenile Delinquency of the S. Comm. on the Judiciary*,
  89th Cong. 67 (1965) ................................................................. 3

*Federal Firearms Act: Hearings Before the Subcomm. to Investigate
  Juvenile Delinquency of the S. Comm. on the Judiciary*,
  90th Cong. 57 (1967) ................................................................. 2

S. Rep. No. 88-1340 (1964) .......................................................... 1

S. Rep. No. 89-1866 (1966) ..................................................... 2, 16

S. Rep. No. 90-1097 (1968) ...................................................... 3, 4

Act of Mar. 6, 1810, ch. 107, § 28, 1810 Mass. Act 151, 176 ...................................... 20

Act of Dec. 22, 1820, ch. 36, § 46, 1820 N.H. Laws 287, 321 ...................................... 20

Act of July 4, 1825, ch. 1, § 24, 1825 Mo. Laws 533, 554 ........................................... 20

Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Laws 17, 17 .............................................. 14

Act of Jan. 12, 1860, ch. 33, § 23, 1859 Ky. Acts 241, 245 ......................................... 14

Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Laws 59, 59 § 1 ...................................... 14

An Act to organize, govern, and discipline the Militia of this State
  ch. 164, § 34, 1821 Me. Laws 687, 716 ......................................................... 20

iv

## Other Authorities:

Act of Mar. 20, 1797, ch. 81, No. 1, § 15, *reprinted in*
   2 *The Laws of the State of Vermont, Digested and Compiled* (1808) ................................... 20

Albert W. Alschuler & Andrew G. Deiss, *A Brief History of the*
   *Criminal Jury in the United States*, 61 U. Chi. L. Rev. 867 (1994) ............................... 11

An Act for raising levies and recruits to serve in the present
   expedition against the French, on the Ohio, ch. II, §§ I-III,
   *reprinted in* 6 *The Statutes at Large; Being a Collection*
   *of All the Laws of Virginia, from the First Session of the Legislature,*
   *in the Year 1619* (1819) ........................................................................................... 19

An Act for the better regulating and training the Militia, ch. II,
   §§ II- III, *reprinted in* 6 *The Statutes at Large; Being a Collection*
   *of All the Laws of Virginia, from the First Session of the Legislature,*
   *in the Year 1619* (1819) ........................................................................................... 19

An Act for the settling and better Regulation of the Militia,
   ch. II, § II, *reprinted in* 4 *The Statutes at Large; Being a Collection*
   *of All the Laws of Virginia, from the First Session of the Legislature,*
   *in the Year 1619* (William Waller Hening ed., 1820) ...................................... 19

An Act to exempt minors from Militia Duty in time of peace (1829),
   *reprinted in A Compilation of the Public Laws of the State of New-Jersey,*
   *Passed Since the Revision in the Year 1820* (Josiah Harrison ed., 1833) ......................... 19

1 William Blackstone, *Commentaries on the Laws of England* (1765) .................................. 11

Jacob Charles, *Armed in America: A History of Gun Rights from Colonial*
   *Militias to Concealed Carry* ch. 4 (2019) ........................................................................ 15

Thomas M. Cooley, *Treatise on Constitutional Limitations* (5th ed. 1883) ......................... 15

Saul Cornell, *"Infants" and Arms Bearing in the Era of the Second Amendment:*
   *Making Sense of the Historical Record,*
   40 Yale L. & Pol'y Rev. Inter Alia 1 (2021) .............................................. 10, 11

John Faucheraud Grimké, *The South-Carolina Justice of Peace*
   (R. Aitken & Son eds., 1788) ........................................................................................ 12

Vivian E. Hamilton, *Adulthood in Law and Culture,*
   91 Tul. L. Rev. 55 (2016) ........................................................................................ 11

*James Madison's Notes of the Constitutional Convention, August 7, 1787*,
  Yale L. Sch. Avalon Project, https://perma.cc/QJ7B-D4J4 ..................................... 12

Pamela S. Karlan, *Ballots and Bullets: The Exceptional History of the*
  *Right to Vote*, 71 U. Cin. L. Rev. 1345 (2003) ............................................. 11

2 James Kent, *Commentaries on American Law* (1827)................................... 10, 11

*Letter from John Adams to James Sullivan, 26 May 1776*,
  https://perma.cc/CE79-RA8K ................................................................. 12

*Militia Act, [25 November 1755]*, Nat'l Archives,
  https://perma.cc/2DFN-Z2GN ................................................................. 19

Randolph Roth, *Why Guns Are and Are Not the Problem*,
  in Jennifer Tucker et al. eds., *A Right to Bear Arms?: The Contested*
  *Role of History in Contemporary Debates on the Second Amendment* (2019) ......................... 13

Kara E. Rudolph et al., *Association Between Connecticut's Permit-to-Purchase*
  *Handgun Law and Homicides*, 105 Am. J. of Pub. Health e49 (2015),
  https://perma.cc/A5K8-ZZQT ................................................................ 2-3

4 *Statutes at Large of Pennsylvania* (James T. Mitchell &
  Henry Flanders eds., 1897) ................................................................ 10

1 Zephaniah Swift, *A System of the Laws of the State of Connecticut*
  (Windham & John Byrne eds., 1795)........................................................ 11

2 *The Code of North Carolina* ch. 35, § 3168, at 346-47 (William T. Dortch,
  John Manning, & John S. Henderson eds., 1883)............................................ 20

*The Code of Tennessee* pt. IV, tit. 1, ch. 9, art. II, § 4864
  (Return J. Meigs & William F. Cooper eds., 1858) ...................................... 14

*The Code of the State of Georgia*, pt. 1, tit. 11 (Richard H. Clark et al. eds., 1861)      19

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331.  JA13.  The district court entered final judgment on December 1, 2023.  JA69.  The government filed a timely notice of appeal on December 8, 2023.  JA83.  This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

For over half a century, Congress has prohibited the commercial sale of handguns to 18-to-20-year-olds.  *See* 18 U.S.C. § 922(b)(1), (c)(1).  The question presented is whether these commercial sale restrictions are consistent with the Second Amendment.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.     Statutory and Regulatory Background

This case concerns legislatures' authority to set age qualifications on the commercial sale of firearms.

Following a multi-year inquiry into violent crime that included "field investigation and public hearings," S. Rep. No. 88-1340, at 1 (1964), Congress found "that the ease with which" handguns could be acquired by "juveniles without the knowledge or consent of their parents or guardians[] . . . and others whose possession of such weapons is similarly contrary to the public interest[] is a significant factor in

the prevalence of lawlessness and violent crime in the United States," Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, tit. IV, § 901(a)(2), 82 Stat. 197, 225.  The legislative record established that "minors under the age of 21 years accounted for 35 percent of the arrests for the serious crimes of violence, including murder, rape, robbery, and aggravated assault," and 21 percent of the arrests for murder.  114 Cong. Rec. 12,309 (1968) (statement of Sen. Dodd).

Based on its investigations, Congress identified "a causal relationship between the easy availability of firearms other than a rifle or shotgun and juvenile and youthful criminal behavior."  Pub. L. No. 90-351, tit. IV, § 901(a)(6), 82 Stat. at 225-26. Federal law enforcement officials testified that "[t]he greatest growth of crime today is in the area of young people, juveniles[,] and young adults" and that "[t]he easy availability of weapons makes their tendency toward wild, and sometimes irrational behavior that much more violent, that much more deadly."  *Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the S. Comm. on the Judiciary*, 90th Cong. 57  (1967) (statement of Sheldon S. Cohen).   Law enforcement officers from New York City, Los Angeles, St. Louis, Chicago, Philadelphia, and Atlanta provided Congress with "statistics documenting the misuse of firearms by juveniles and minors."  S. Rep. No. 89-1866, at 59 (1966); *see also id.* at 58, 60.  These legislative findings accord with more recent empirical evidence identifying a relationship between setting the minimum age to purchase handguns at 21 and a decrease in violent crime.  *See, e.g.*, Kara E. Rudolph et al., *Association Between Connecticut's Permit-to-*

*Purchase Handgun Law and Homicides*, 105 Am. J. of Pub. Health e49, e49-50 (2015), https://perma.cc/A5K8-ZZQT.

Congress's investigations revealed that "almost all of these firearms[] are put into the hands of juveniles by importers, manufacturers, and dealers who operate under licenses issued by the Federal Government."  *Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the S. Comm. on the Judiciary*, 89th Cong. 67 (1965) (statement of Sheldon S. Cohen).  Thus, Congress found that concealable firearms (such as handguns) "have been widely sold by federally licensed importers and dealers to emotionally immature, or thrill-bent juveniles and minors prone to criminal behavior."  Pub. L. No. 90-351, tit. IV, § 901(a)(6), 82 Stat. at 225-26.  Congress accordingly concluded "that only through adequate Federal control over interstate and foreign commerce in these weapons, and over all persons engaging in the businesses of importing, manufacturing, or dealing in them, can this grave problem be properly dealt with, and effective State and local regulation of this traffic be made possible."  *Id.* § 901(a)(3), 82 Stat. at 225.

To that end, Congress included statutory provisions designed to address "[t]he clandestine acquisition of firearms by juveniles and minors," S. Rep. No. 90-1097, at 79 (1968), in both the Omnibus Crime Control and Safe Streets Act of 1968 and the Gun Control Act of 1968, Pub. L. No. 90-618, tit. I, § 101, 82 Stat. 1213, 1213-14.  Those provisions are codified at Sections 922(b)(1) and (c) of Title 18.  In addition to prohibiting federal firearms licensees from selling "any firearm or ammunition to any

individual" under the age of 18, Section 922(b)(1) limits licensee sales of firearms to individuals between the ages of 18 and 20 to "a shotgun or rifle, or ammunition for a shotgun or rifle."[1]  And under Section 922(c)(1), a federal firearms licensee may "sell a firearm to a[n unlicensed] person who does not appear in person at the licensee's business premises" only if the purchaser submits a sworn statement attesting that "in the case of any firearm other than a shotgun or a rifle, [the purchaser is] twenty-one years or more of age, or that, in the case of a shotgun or a rifle, [the purchaser is] eighteen years or more of age."  *Id.* § 922(c)(1).

Sections 922(b)(1) and (c)(1) are restrictions on the commercial sale of handguns and do not prohibit the possession of handguns by 18-to-20-year-olds or the purchase of rifles or shotguns by those individuals.  Congress recognized that, under these commercial sale restrictions, "a minor or juvenile would not be restricted from owning, or learning the proper usage of [a] firearm, since any firearm which his parent or guardian desired him to have could be obtained for the minor or juvenile by the parent or guardian."  S. Rep. No. 90-1097, at 79.  The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), which is authorized to promulgate "such rules and regulations as are necessary to carry out" Title 18's provisions relating to

---

[1] A federal firearms license is required to "engage in the business of importing, manufacturing, or dealing in firearms" or "ammunition."  18 U.S.C. § 922(a)(1).  A person is "engaged in the business" of dealing in firearms, *id.* § 921(a)(21), if that person "devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms," *id.* § 921(a)(21)(C).

4

firearms, 18 U.S.C. § 926, has issued implementing regulations that closely track the statutory restrictions, *see, e.g.*, 27 C.F.R. § 478.99(b).

In addition to enacting the commercial sale restrictions at issue here, Congress has also promulgated various other age-based firearms regulations. For example, Congress has limited the circumstances in which individuals under 18 years old may possess handguns. *See* Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, tit. XI, subtitle B, § 110201(a), 108 Stat. 1796, 2010-11 (adding 18 U.S.C. § 922(x)). And in 2022, Congress adopted provisions that require enhanced background checks for individuals under the age of 21. *See* Bipartisan Safer Communities Act, Pub. L. No. 117-159, div. A, tit. II, § 12001(a)(1)(B)(i)(III), 136 Stat. 1313, 1323 (2022) (codified as amended at 18 U.S.C. § 922(t)(1)(C)).

### B.    Prior Proceedings

Plaintiffs are two 18-to-20-year-olds and one advocacy organization with 18-to-20-year-old members. JA10-11. They assert that the commercial sale restrictions violate the Second Amendment and request declaratory and injunctive relief. JA27-28.

After plaintiffs moved for summary judgment, the district court granted the motion. The court relied on the district court decision in *Fraser v. ATF*, No. 22-410 (E.D. Va.), a case that is currently on appeal before this Court, *see McCoy v. ATF*, No. 23-2085. The court noted that the Second Amendment's scope turns on "text" and "the Nation's historic tradition of firearm regulation." JA38 (quoting *New York State*

*Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022)). Like the court in *Fraser*, the district court here expressed the view that at the founding "eighteen (18) was the age of majority for militia service" and that the Second Amendment therefore entitles 18-to-20-year-olds to obtain handguns from commercial sellers. JA63. The court acknowledged that in the nineteenth century many jurisdictions prohibited the commercial sale of handguns to 18-to-20-year-olds but appeared to assign no weight to those prohibitions. JA66. Relying instead on its interpretation of Founding Era militia laws, the court held unconstitutional the federal restrictions.

The district court then entered declaratory and injunctive relief on behalf of plaintiffs. JA80. At the government's request, the court entered a stay pending appeal. JA81.

## SUMMARY OF ARGUMENT

For over half a century, federal law has prohibited federal firearms licensees from selling handguns to individuals under the age of 21. *See* 18 U.S.C. § 922(b)(1), (c). These restrictions do not prevent 18-to-20-year-olds from purchasing rifles and shotguns, from possessing and carrying handguns, or from obtaining handguns from their parents or guardians. Because the restrictions regulate only the commercial sale of handguns to underage individuals, they fall within the class of "conditions and qualifications on the commercial sale of arms" that the Supreme Court has taken pains not to call into question. *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008); *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010).

6

Unlike the exceptional laws the Supreme Court invalidated in *Heller* and *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the commercial sale restrictions reflect a historical tradition that stretches from the founding to the present. At the founding, legislatures established an age qualification of 21 for a variety of important rights, and there is no evidence that the Second Amendment's ratifiers believed that the Amendment would preclude adoption of the same age qualification for the commercial sale of arms. During the nineteenth century, when handguns became more lethal and more widespread, at least 20 jurisdictions barred the commercial sale of handguns to 18-to-20-year-olds. And in modern times, "all fifty States (and the District of Columbia)" have "imposed minimum-age qualifications on the use or purchase of particular firearms." *National Rifle Ass'n of Am., Inc. v. ATF* (*NRA*), 700 F.3d 185, 190 n.4 (5th Cir. 2012).

In nonetheless holding unconstitutional the federal restrictions, the district court relied in large part on mistaken legal and factual assumptions regarding militias at the time of the founding. First, although the court assumed that all individuals over the age of 18 were eligible to join the militia, Founding Era legislatures retained authority to exclude 18-to-20-year-olds. *See NRA*, 700 F.3d at 204 n.17 (collecting examples). Second, the ability to carry firearms while serving in the militia or its historical successors does not imply a right to bear arms outside the supervised context of militia service. As the Supreme Court has explained, the Second

7

Amendment codifies "an individual right unconnected to militia service." *Heller*, 554 U.S. at 611.

The district court likewise erred in excluding from its historical analysis nineteenth century evidence the Supreme Court has identified as germane. *Heller* recognizes evidence from that period as a "critical tool of constitutional interpretation," 554 U.S. at 605, and the Supreme Court routinely consults such evidence in Second Amendment cases and in cases involving the historical scope of other constitutional provisions.

## STANDARD OF REVIEW

This Court reviews the district court's grant of a motion for summary judgment de novo. *See Carolina Youth Action Project; Ford ex rel. D.S. v. Wilson*, 60 F.4th 770, 777 (4th Cir. 2023).

## ARGUMENT

### The Second Amendment Allows Congress To Prohibit The Commercial Sale of Handguns To Individuals Under The Age Of 21

**A.** For more than 50 years, federal law has barred federal firearms licensees from selling handguns to 18-to-20-year-olds. *See* 18 U.S.C. § 922(b)(1), (c)(1). The restrictions do not prevent 18-to-20-year-olds from "possess[ing] and us[ing] handguns." *NRA*, 700 F.3d 185, 189 (5th Cir. 2012). Nor do the restrictions prevent those individuals from obtaining handguns "from parents or guardians" or "though

unlicensed, private sales." *Id.* at 190-91.  The restrictions also do not prevent 18-to-20-year-olds from purchasing rifles or shotguns.

Those limited restrictions comport with the Second Amendment.  The Constitution protects an individual right to keep and bear arms, but, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008).  In identifying categories of lawful regulations, courts consult the Second Amendment's "text, as informed by history," and "the Nation's historical tradition of firearm regulation." *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 19, 24 (2022).  Both considerations thus require a review of history.

Two mutually reinforcing categories of historical evidence show that legislatures retain authority to restrict the commercial sale of arms to underage individuals.  First, Founding Era evidence reflects that the ratifiers did not view the Second Amendment as stripping legislatures of authority to prohibit the commercial sale of handguns to 18-to-20-year-olds.  Second, nineteenth century evidence demonstrates that at least 20 jurisdictions enacted laws that parallel the federal restrictions and that those laws were recognized as constitutional by courts, legislatures, and the public.

**1.** Nothing in the Second Amendment's text or original public meaning entitles 18-to-20-year-olds to obtain handguns from federal firearms licensees.  By its terms, the Amendment addresses a right to "keep and bear arms," U.S. Const. amend. II,

and does not codify a right of underage individuals to purchase handguns from commercial sellers when those weapons remain available through other sources. In keeping with the Second Amendment's text, in *Heller* the Court emphasized that nothing in its opinion "should be taken to cast doubt" on "laws imposing conditions and qualifications on the commercial sale of arms," 554 U.S. at 626-27 & 627 n.26, in *McDonald v. City of Chicago* the Court "repeat[ed]" those "assurances," 561 U.S. 742, 786 (2010), and in *Bruen* the Chief Justice and Justice Kavanaugh reiterated that nothing in the Court's opinion "should be taken to cast doubt on . . . laws imposing conditions and qualifications on the commercial sale of arms," 597 U.S. at 81 (Kavanaugh, J., joined by Roberts, C.J., concurring) (quoting *Heller*, 554 U.S. at 626-27).

Evidence from the founding confirms that the Second Amendment's text was not understood as preventing legislatures from implementing age qualifications on access to arms. At the founding, as today, legislatures established age qualifications for a range of activities, from getting married, *see, e.g.*, 4 *Statutes at Large of Pennsylvania* 153 (James T. Mitchell & Henry Flanders eds., 1897), to becoming a naturalized citizen, *see* Act of Mar. 26, 1790, ch. 3, 1 Stat. 103, 103-04; Act of Jan. 29, 1795, ch. 20, 1 Stat. 414, 414-15, to forming enforceable contracts, *see* 2 James Kent, *Commentaries on American Law* 101 (1827); *see also* Saul Cornell, *"Infants" and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record*, 40 Yale L. & Pol'y Rev. Inter Alia 1, 9-10 (2021) (collecting examples).

10

For the Second Amendment's ratifiers, a natural point at which to draw the line between underage individuals and responsible adults was age 21. "The age of majority at common law was 21" and at the founding, individuals under that age were classified as "minor[s]" or "infant[s]." *NRA*, 700 F.3d at 201; *see* 1 William Blackstone, *Commentaries on the Laws of England* 451 (1765) ("So that full age in male or female, is twenty one years[] . . . who till that time is an infant, and so styled in law."). Consistent with the common law understanding, the "American colonies, then the United States, adopted age twenty-one as the near universal age of majority." Vivian E. Hamilton, *Adulthood in Law and Culture*, 91 Tul. L. Rev. 55, 64 (2016); *see* 2 Kent, *supra*, at 191 (confirming that "the inability of infants to take care of themselves[] . . . continues, in contemplation of law, until the infant has attained the age of twenty-one years").

Legislatures thus set 21 as the age qualification for many important activities. Among other examples, under-21-year-olds generally could not "claim the right of petition," Cornell, *supra*, at 8-10; enter many kinds of contracts, *see* 1 Zephaniah Swift, *A System of the Laws of the State of Connecticut* 213-16 (Windham & John Byrne eds., 1795); serve on juries, *see* Albert W. Alschuler & Andrew G. Deiss, *A Brief History of the Criminal Jury in the United States*, 61 U. Chi. L. Rev. 867, 877 n.52 (1994) (finding no evidence that historical legislatures authorized individuals under the age of 21 to serve on juries); or vote, *see* Pamela S. Karlan, *Ballots and Bullets: The Exceptional History of the Right to Vote*, 71 U. Cin. L. Rev. 1345, 1345, 1358-59 (2003) (explaining that state

legislatures allowed individuals to vote only after they turned 21, a practice that

persisted from the founding through the 26th Amendment's passage in 1971).

In explaining these age qualifications, the founders emphasized their view that

reason and judgment are not fully developed before age 21.  For example, John

Adams observed that individuals under that age could not vote because they lack

"[j]udgment" and "[w]ill" and are not "fit to be trusted by the [p]ublic."  *Letter from*

*John Adams to James Sullivan, 26 May 1776*, https://perma.cc/CE79-RA8K (on file with

the National Archives).  Gouverneur Morris, a signer of the Constitution and drafter

of its Preamble, likewise warned that under-21-year-olds "want prudence" and "have

no will of their own."  *James Madison's Notes of the Constitutional Convention, August 7,*

*1787*, Yale L. Sch. Avalon Project, https://perma.cc/QJ7B-D4J4.  Similarly, although

at the founding citizens generally had a duty to serve as peace officers, among those

ineligible for such service were "infants"—that is, individuals under the age of 21.

John Faucheraud Grimké, *The South-Carolina Justice of Peace* 117-18 (R. Aitken & Son

eds., 1788).  There is no basis for concluding that the founders nevertheless believed

that 18-to-20-year-olds were constitutionally entitled to purchase lethal weapons

without parental approval.

That conclusion accords with historical norms concerning parental supervision

of 18-to-20-year-olds.  Founding Era parents generally retained substantial authority

to supervise individuals under the age of 21.  *See Brown v. Entertainment Merchs. Ass'n*,

564 U.S. 786, 834 (2011) (Thomas, J., dissenting).  Nothing in the historical record

12

suggests that when the founders codified the Second Amendment, they intended to alter that paradigm.

**2.** Nineteenth century evidence supports the same conclusion. The Supreme Court has described evidence from that period as a "critical tool of constitutional interpretation." *Heller*, 554 U.S. at 605. The Court explained that "the public understanding of a legal text in the period after its enactment" is probative as to its meaning. *Id.* Thus, the Court looks to nineteenth century sources in discerning the historical scope of various constitutional provisions, including the Second Amendment, *see, e.g.*, *id.* at 605-19 (considering evidence "through the end of the 19th century"); *Bruen*, 597 U.S. at 35-36, 50-56 (same).

Within a lifetime of the founding, state legislatures enacted laws that parallel the restrictions challenged here. At the founding, handguns were rare, fired only one shot, often misfired, took a long time to load, and could not be kept loaded for extended periods. *See* Randolph Roth, *Why Guns Are and Are Not the Problem*, in Jennifer Tucker et al. eds., *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 113, 117-18 (2019). By the mid-nineteenth century, "a burst of innovations in the arms industry" resulted in revolvers that could be loaded and fired quickly. *Id.* at 121-24. As handguns became more lethal and more widespread, legislatures moved to limit the sale of those weapons to underage individuals.

13

For as long as legislatures have codified age qualifications on the commercial sale of handguns, they have drawn the line at age 21. As early as 1856, Alabama forbade providing "to any male minor" any "air gun or pistol," Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Laws 17, 17, and "[a]t that time, the age of majority in Alabama was twenty-one years," *National Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1325 (11th Cir.), *opinion vacated upon granting of rehearing en banc*, 72 F.4th 1346 (11th Cir. 2023). Two years later, Tennessee likewise barred providing "to any minor a pistol[] . . . or like dangerous weapon, except a gun for hunting or weapon for defence in travelling." *The Code of Tennessee* pt. IV, tit. 1, ch. 9, art. II, § 4864, at 871 (Return J. Meigs & William F. Cooper eds., 1858). A year after that, Kentucky similarly prevented anyone other than parents or guardians from providing "any pistol[] . . . or other deadly weapon[] . . . to any minor." Act of Jan. 12, 1860, ch. 33, § 23, 1859 Ky. Acts 241, 245.

In the decades surrounding the passage of the Fourteenth Amendment, which established that the Second Amendment, like other provisions of the Bill of Rights, is applicable to the states, at least 20 jurisdictions restricted the purchase of firearms by 18-to-20-year-olds. The scope of these laws varied, but all of them prohibited 18-to-20-year-olds from purchasing handguns without the approval of their parents or guardians. An 1875 Indiana law, for example, made it a crime "for any person to sell, barter, or give to any other person, under the age of twenty-one years, any pistol" or similar deadly weapon. Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Acts 59, 59 § 1. In

addition to the Alabama, Tennessee, and Kentucky laws cited above, similar prohibitions were also enacted in Delaware (1881), the District of Columbia (1892), Georgia (1876), Illinois (1881), Iowa (1884), Kansas (1883), Louisiana (1890), Maryland (1882), Mississippi (1878), Missouri (1879), North Carolina (1893), Oklahoma (1890), Texas (1897), West Virginia (1882), Wisconsin (1883), and Wyoming (1890). The prohibitions thus spanned every region of the country and covered much of the population. The addendum to this brief provides source and citation information for each prohibition.

The prohibitions were widely recognized and approved by courts, commentators, and the public. One review of newspaper editorials and other sources of the period noted consistent support for "laws restricting the sale of dangerous weapons to minors." Jacob Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* ch. 4 & n.211-12 (2019). Thomas Cooley, who wrote a "massively popular" treatise that *Heller* cited with approval, 554 U.S. at 616, likewise explained "[t]hat the State may prohibit the sale of arms to minors," Thomas M. Cooley, *Treatise on Constitutional Limitations* 740 n.4 (5th ed. 1883).

In what appears to be the sole nineteenth century judicial decision addressing age prohibitions parallel to those at issue here, the Tennessee Supreme Court upheld a state law prohibiting the sale of pistols to under-21-year-olds. The court held that the law was "not only constitutional as tending to prevent crime but wise and salutary in all its provisions." *State v. Callicutt*, 69 Tenn. 714, 716-17 (1878). In contrast, in a

15

decision issued a few years earlier, the same court concluded that "a statute that forbade openly carrying a pistol" contravened the state constitution's Second Amendment analogue. *Heller*, 554 U.S. at 629 (citing *Andrews v. State*, 50 Tenn. 165, 187 (1871)). "[T]he fact that there was apparently only a single challenge to these [prohibitions'] constitutionality until well into the twentieth century" further illustrates that the public "considered the statutory prohibitions constitutionally permissible." *Bondi*, 61 F.4th at 1330.

Nineteenth century evidence thus provides overwhelming support for the challenged restrictions. In analyzing whether historical laws constitute "analogue[s]" justifying a modern firearms regulation, *Bruen* reviewed "two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." 597 U.S. at 28-30. Both metrics reflect that the restrictions at issue here rest on firm historical foundations. With respect to the "why" metric, historical laws were enacted "to prevent crime" by minors. *Callicutt*, 69 Tenn. at 716. The modern restrictions likewise address "the misuse of firearms by juveniles and minors." S. Rep. No. 89-1866, at 59. And with respect to the "how" metric, historical and modern laws both regulate the transfer of firearms by the same suppliers (commercial sellers) to the same recipients (18-to-20-year-olds).

It is a testament to the strength of this historical tradition that in modern times, "all fifty States (and the District of Columbia) have imposed minimum-age qualifications on the use or purchase of particular firearms." *NRA*, 700 F.3d at 190

16

n.4.  The restrictions challenged here thus stand in stark contrast to the "outlier[]"

laws the Supreme Court invalidated in *Bruen* and *Heller*.  *Bruen*, 597 U.S. at 70; *see id.* at

78-79 (Kavanaugh, J., joined by Roberts, C.J., concurring) (highlighting the "unusual"

nature and "extreme outlier" status of the New York law in *Bruen*); *Heller*, 554 U.S. at

629 (noting that "[f]ew laws in the history of our Nation have come close to the

severe restriction of the District's handgun ban").  As Justice Alito emphasized in

concurrence, *Bruen* therefore "does not expand the categories of people who may

lawfully possess a gun" and federal law thus continues to "bar[] the sale of a handgun

to anyone under the age of 21."  *Bruen*, 597 U.S. at 73 (Alito, J., concurring) (citing 18

U.S.C. §§ 922(b)(1), (c)(1)).[2]

    **B.**  The district court's decision reflects significant misunderstandings of the

relevant historical evidence and of the Supreme Court's methodology for analyzing

that evidence.

    **1.**  A central premise of the district court's reasoning was that the Second

Amendment's scope hinges on historical militia laws.  The court believed that at the

---

[2] A divided panel of the Third Circuit recently held unconstitutional under the
Second Amendment certain state laws that "when combined with a state or municipal
emergency declaration . . . have the practical effect of preventing most 18-to-20-year-
old adult Pennsylvanians from carrying firearms."  *Lara v. Commissioner Pennsylvania
State Police*, No. 21-1832, slip op. at 5 (Jan. 18, 2024).  In contrast to the federal age
restrictions at issue here, the state age restrictions in *Lara* applied to all firearms, not
just handguns, and prevented the public carriage of those weapons, not just their sale
by federal firearms licensees.  For the reasons given above, the federal restrictions on
the commercial sale of handguns pass muster under *Bruen*'s history-focused test.

founding "eighteen (18) was the age of majority for militia service" and that 18-to-20-year-olds therefore had a right to acquire handguns outside the context of militia service. JA63.

But Founding Era legislatures retained discretion to exclude 18-to-20-year-olds from militias. The district court cited (at JA63) the National Militia Act of 1792, which provided that "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years (*except as is herein after excepted*) shall severally and respectively be enrolled in the militia." Militia Act § 1, 1 Stat. 271, 271 (1792) (emphasis added). But the next section of the Act "gave States discretion to impose age qualifications on service." *NRA*, 700 F.3d at 204 n.17; *see* Militia Act § 2, 1 Stat. at 272 (excluding from the militia "all persons who now are or may hereafter be exempted by the laws of the respective states"). Indeed, when the governor of Massachusetts requested legal advice on this issue, the Massachusetts Supreme Judicial Court concluded: "[I]t is competent for the State legislature by law to exempt from enrol[l]ment in the militia, all persons under twenty-one and over thirty years of age." *In re Opinion of the Justices*, 39 Mass. (22 Pick) 571, 576 (1838).

Thus, "in some colonies and States, the minimum age of militia service either dipped below age 18 or crept to age 21, depending on legislative need." *NRA*, 700 F.3d at 204 n.17. Virginia set a minimum age of 21, which it lowered in times of

18

exceptional need, for example, in 1755 prior to the Seven Years War.[3]  Other states—
including Georgia, New Jersey, and North Carolina—enrolled only individuals over
21 in their respective militias at various points between the late eighteenth century and
the mid-nineteenth century.[4]  "Such fluctuation undermines [any] militia-based claim
that the right to purchase arms must fully vest precisely at age 18."  *Id.*

Indeed, Founding Era militia laws exemplify the tradition of adult supervision
over 18-to-20-year-olds' access to arms.  Pennsylvania's 1755 Militia Act, drafted by
Benjamin Franklin, permitted individuals under 21 to enroll in the militia but provided
"[t]hat no [y]outh, under the [a]ge of [t]wenty-one [y]ears, . . . shall be admitted to
enroll himself[] . . .  without the [c]onsent of his or their [p]arents or [g]uardians,
[m]asters or [m]istresses, in Writing under their Hands."  *Militia Act, [25 November
1755]*, Nat'l Archives, https://perma.cc/2DFN-Z2GN.  In a similar vein, at least six

---

[3] *See* An Act for the settling and better Regulation of the Militia, ch. II, § II,
*reprinted in* 4 *The Statutes at Large; Being a Collection of All the Laws of Virginia, from the First
Session of the Legislature, in the Year 1619*, at 118, 118 (William Waller Hening ed., 1820)
(originally promulgated in 1723); An Act for raising levies and recruits to serve in the
present expedition against the French, on the Ohio, ch. II, §§ I-III, *reprinted in* 6
Hening, *supra*, at 438, 438-39 (1819) (originally promulgated in 1754); An Act for the
better regulating and training the Militia, ch. II, §§ II- III, *reprinted in* 6 Hening, *supra*, at
530, 530-31 (1819) (originally promulgated in 1755).

[4] *See, e.g.*, *The Code of the State of Georgia*, pt. 1, tit. 11, chs. 1, 2, §§ 981, 1027, at
189, 189, 199 (Richard H. Clark et al. eds., 1861); An Act to exempt minors from
Militia Duty in time of peace (1829), *reprinted in A Compilation of the Public Laws of the
State of New-Jersey, Passed Since the Revision in the Year 1820*, at 266, 266 (Josiah Harrison
ed., 1833); N.C. Const. of 1868, art. XII, § 1.

states—including Massachusetts (1810), New Hampshire (1821), Vermont (1807), North Carolina (1806), Maine (1821), and Missouri (1826)—required parents to furnish the firearms for their children's militia duty, presumably on the assumption that minors could not obtain arms themselves.[5]

In any event, authorization to carry a firearm while serving in the militia, or in highly regulated entities such as the National Guard, does not determine the scope of the right to bear arms outside that context. As the Supreme Court has emphasized, the founders understood the Second Amendment as codifying "an individual right unconnected with militia service." *Heller*, 554 U.S. at 582. "[M]erely being part of the militia" thus did not establish an entitlement to Second Amendment rights. *Bondi*, 61 F.4th at 1331.

**2.** The district court also erred in disregarding (at JA66) the nineteenth century analogues for the commercial sale restrictions discussed above. The Supreme Court has explained that while nineteenth century materials may "not provide as much insight into [the Second Amendment's] original meaning" as Founding Era sources, those materials nonetheless constitute a "critical tool of constitutional interpretation."

---

[5] *See* Act of Mar. 6, 1810, ch. 107, § 28, 1810 Mass. Acts 151, 176; Act of Dec. 22, 1820, ch. 36, § 46, 1820 N.H. Laws 287, 321; Act of Mar. 20, 1797, ch. 81, No. 1, § 15, *reprinted in* 2 *The Laws of the State of Vermont, Digested and Compiled* 122, 131-32 (1808); 2 *The Code of North Carolina* ch. 35, § 3168, at 346-47 (William T. Dortch, John Manning, & John S. Henderson eds., 1883); An Act to organize, govern, and discipline the Militia of this State ch. 164, § 34, 1821 Me. Laws 687, 716; Act of July 4, 1825, ch. 1, § 24, 1825 Mo. Laws 533, 554.

*Bruen*, 597 U.S. at 20, 36 (quoting *Heller*, 554 U.S. at 605, 614).  The Court's extensive review of nineteenth century evidence in both *Heller* and *Bruen* confirms that such evidence plays an important part in Second Amendment analysis.  *See Heller*, 554 U.S. at 605-19 (considering evidence "through the end of the 19th century"); *Bruen*, 597 U.S. at 35-36, 50-56 (same); *see id.* at 30 (looking to "18th- and 19th-century" evidence in discussing the scope of the sensitive places doctrine).  That numerous nineteenth century jurisdictions prohibited the purchase of handguns by 18-to-20-year-olds—and that there is no evidence that those prohibitions were viewed as infringing the right to keep and bear arms—thus provides strong support for the challenged restrictions.

   **3.** The district court's reasoning is flawed in other respects as well.  The court observed, for example, that "because neither the First nor Fourth Amendments exclude[] . . . 18-to-20-year-olds, [there is] no reason to read an implicit age restriction into the Second Amendment[]."  JA57.  But permissible restrictions on the purchase of firearms are not determined by direct reference to the protections of the First or Fourth Amendments.  As *Bruen* makes clear, any interpretation of the Second Amendment's text must be "informed by history," 597 U.S. at 19, and history shows that the Second, First, and Fourth Amendments do not share the same scope.  If the scope of the Second Amendment was coterminous with that of the First or Fourth Amendments, the Supreme Court's focus on "the Nation's historical tradition of firearm regulation" would appear to be misplaced.  *Id.* at 24.

It was similarly incorrect for the district court to suggest (at JA55) that constitutional provisions codifying age qualifications for federal elected offices indicate that the ratifiers meant to preclude legislatures from establishing similar qualifications in other constitutional contexts. Under that theory no age qualification—even age 18—could apply. By setting age qualifications for Presidents, Senators, and Members of Congress, the framers did not preclude legislatures from enacting any age qualifications for all other activities.

The error of the district court's analysis is illustrated by the significance it attached to the Supreme Court's holding that capital punishment constitutes cruel and unusual punishment for persons under 18 but is otherwise constitutionally permissible. JA58 (citing *Roper v. Simmons*, 543 U.S. 551, 574 (2005)). Insofar as the Supreme Court's analysis is relevant, it underscores the district court's error in suggesting that the Second Amendment's drafters did not "contemplate[] age restrictions." JA55. More generally, the Supreme Court's inquiry into the constitutionality of a particular punishment for Eighth Amendment purposes does not determine the scope of the protections afforded by the Second Amendment. That is particularly clear because the Eighth Amendment analysis is explicitly ahistorical. Punishments that were once commonly accepted no longer survive constitutional scrutiny in light of an "evolving standards of decency" test that focuses on "contemporary" standards. *Roper*, 543 U.S. at 562-63. In looking to contemporary standards, the Supreme Court has concluded that capital punishment of persons over

18 is permissible because "[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood." *Id.* at 574. The inquiry into contemporary standards of decency says nothing about "this Nation's historical tradition," *Bruen*, 597 U.S. at 17, with regard to the right to bear arms.

The district court was likewise mistaken in relying (at JA58-60) on the decision of a divided panel of this Court invalidating the federal restrictions. That case became moot before further review was possible, and the decision was accordingly vacated. *See Hirschfeld v. ATF*, 5 F.4th 407, 452 (4th Cir. 2021), *as amended* (July 15, 2021), *vacated*, 14 F.4th 322, 325 (4th Cir. 2021). A vacated opinion has no "precedential value within this circuit," *In re Naranjo*, 768 F.3d 332, 344 n.14 (4th Cir. 2014), and for the reasons given above, the challenged restrictions pass constitutional muster under *Bruen*'s history-focused test.

**4.** The district court compounded its error by awarding injunctive relief without addressing the prerequisites for such relief. A district court may grant injunctive relief only when it "determine[s] that an injunction *should* issue under the traditional four-factor test." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157-58 (2010). In this case, however, the district court assumed that plaintiffs were entitled to an injunction (JA67-68), without analyzing the four-factor test or affording the government an opportunity to brief the issue. This Court recently reaffirmed that, before entering an injunction, a district court "must not only comply with the applicable Rules of Civil Procedure, but also carefully assess whether the appropriate four-factor test is

23

satisfied." *Wudi Indus. (Shanghai) Co. v. Wong*, 70 F.4th 183, 192-93 (4th Cir. 2023).

Because the district court's decision satisfied neither requirement, the injunction

cannot withstand appellate review.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

## REQUEST FOR ORAL ARGUMENT

Plaintiffs challenge the constitutionality of longstanding provisions of federal law.  The federal government believes that oral argument is therefore appropriate.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
    *General*
WILLIAM J. IHLENFELD, II
  *United States Attorney*

MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT

 *s/ Steven H. Hazel*
STEVEN H. HAZEL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7217*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2498*
  *Steven.H.Hazel@usdoj.gov*

January 2024

25

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,053 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Steven H. Hazel*

Steven H. Hazel

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Steven H. Hazel*
Steven H. Hazel

**ADDENDUM**

# TABLE OF CONTENTS

18 U.S.C. § 922.................................................................................................... A1

27 C.F.R. § 478.99 ............................................................................................. A2

Table of Historical Laws Restricting the Sale of Handguns to Eighteen-to-
    Twenty-Year-Olds ................................................................................... A3

**18 U.S.C. § 922**

**§ 922. Unlawful acts**

. . .

(b) It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver--

(1) any firearm or ammunition to any individual who the licensee knows or has reasonable cause to believe is less than eighteen years of age, and, if the firearm, or ammunition is other than a shotgun or rifle, or ammunition for a shotgun or rifle, to any individual who the licensee knows or has reasonable cause to believe is less than twenty-one years of age;

. . . .

(c) In any case not otherwise prohibited by this chapter, a licensed importer, licensed manufacturer, or licensed dealer may sell a firearm to a person who does not appear in person at the licensee's business premises (other than another licensed importer, manufacturer, or dealer) only if--

(1) the transferee submits to the transferor a sworn statement in the following form:

"Subject to penalties provided by law, I swear that, in the case of any firearm other than a shotgun or a rifle, I am twenty-one years or more of age, or that, in the case of a shotgun or a rifle, I am eighteen years or more of age; that I am not prohibited by the provisions of chapter 44 of title 18, United States Code, from receiving a firearm in interstate or foreign commerce; and that my receipt of this firearm will not be in violation of any statute of the State and published ordinance applicable to the locality in which I reside.

Further, the true title, name, and address of the principal law enforcement officer of the locality to which the firearm will be delivered are_____.

Signature ........ Date ........"

and containing blank spaces for the attachment of a true copy of any permit or other information required pursuant to such statute or published ordinance;

. . . .

A1

**27 C.F.R. § 478.99**

**§ 478.99. Certain prohibited sales or deliveries**

. . . .

(b) Sales or deliveries to underaged persons. A licensed importer, licensed manufacturer, licensed dealer, or licensed collector shall not sell or deliver (1) any firearm or ammunition to any individual who the importer, manufacturer, dealer, or collector knows or has reasonable cause to believe is less than 18 years of age, and, if the firearm, or ammunition, is other than a shotgun or rifle, or ammunition for a shotgun or rifle, to any individual who the importer, manufacturer, dealer, or collector knows or has reasonable cause to believe is less than 21 years of age, or (2) any firearm to any person in any State where the purchase or possession by such person of such firearm would be in violation of any State law or any published ordinance applicable at the place of sale, delivery, or other disposition, unless the importer, manufacturer, dealer, or collector knows or has reasonable cause to believe that the purchase or possession would not be in violation of such State law or such published ordinance.

. . . .

**Table of Historical Laws Restricting the Sale of Handguns to Eighteen-to-Twenty-Year-Olds**

| Jurisdiction | Year | Source | Available At |
|---|---|---|---|
| Alabama | 1856 | 1856 Ala. Acts 17, No. 26, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/ssal0178&i=17 |
| Chicago, Illinois | 1873 | Proceedings of the Common Council of the City of Chicago for the Municipal Year 1872-3, at 113-14 (1874) | https://hdl.handle.net/2027/uiug.30112089447939?urlappend=%3Bseq=192%3Bownerid=13510798902234869-196 |
| Delaware | 1881 | 16 Del. Laws 716 (1881) | https://heinonline.org/HOL/Page?handle=hein.ssl/ssde0173&id=430&collection=ssl |
| District of Columbia | 1892 | 27 Stat. 116-17 (1892) | https://hdl.handle.net/2027/hvd.hj1gjl?urlappend=%3Bseq=294%3Bownerid=27021597767057788-314 |
| Georgia | 1876 | 1876 Ga. Laws 112, No. CXXVIIII (O. No. 63), § 1 | https://heinonline.org/HOL/P?h=hein.ssl/ssga0180&i=112 |
| Illinois | 1881 | 1881 Ill. Laws 73, § 2 | https://heinonline.org/HOL/P?h=hein.ssl/ssil0240&i=81 |
| Indiana | 1875 | 1875 Ind. Laws 59, ch. XL, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/ssin0221&i=59 |
| Iowa | 1884 | 1884 Iowa Acts and resolutions 86, ch. 78, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/ssia0095&i=114 |
| Kansas | 1883 | 1883 Kan. Sess. Laws 159, ch. CV, 1-2 | https://heinonline.org/HOL/P?h=hein.ssl/ssks0111&i=169 |
| Kentucky | 1859 | Edward Bullock and William Johnson, *The General Statutes of the Commonwealth of Kentucky* 359, § 1 (1873) | https://heinonline.org/HOL/P?h=hein.sstatutes/gcucky0001&i=371 |

A3

| Lincoln, Nebraska | 1895 | 1895 Neb. Laws 237-38, *Laws of Nebraska Relating to the City of Lincoln*, Art. XXVI, §§ 2, 5 | https://heinonline.org/HOL/P?h=hein.ssl/ssne0123&i=247 |
|---|---|---|---|
| Louisiana | 1890 | 1890 La. Acts 39, No. 46, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/ssla0223&i=39 |
| Maryland | 1882 | 1882 Md. Laws 656, ch. 424, § 2 | https://heinonline.org/HOL/P?h=hein.ssl/ssmd0444&i=656 |
| Mississippi | 1878 | 1878 Miss. Laws 175, ch. 66, §§ 1-2 | https://heinonline.org/HOL/P?h=hein.ssl/ssms0207&i=207 |
| Missouri | 1879 | *Revised Statutes of the State of Missouri* 224, § 1274 (1879) | https://heinonline.org/HOL/P?h=hein.sstatutes/ristesm0001&i=320 |
| Nevada | 1885 | 1885 Nev. Stat. 51, ch. 51, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/ssnv0097&i=61 |
| North Carolina | 1893 | 1893 N.C. Pub. L. & Res. 468, ch. 514, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/ssnc0078&i=498 |
| Oklahoma | 1890 | 1890 Okla. Laws 495, ch. 25, art. 47, § 3 | https://heinonline.org/HOL/P?h=hein.ssl/ssok0081&i=511 |
| Tennessee | 1856 | 1856 Tenn. Acts 92, ch. 81, § 2 | https://heinonline.org/HOL/P?h=hein.ssl/sstn0249&i=108 |
| Texas | 1897 | 1897 Tex. Gen. Laws 221-22, ch. 155, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/sstx0251&i=245 |
| West Virginia | 1882 | 1882 W. Va. Acts 421-22, ch. 135, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/sswv0101&i=421 |
| Wisconsin | 1883 | 1883 Wis. Sess. Laws 290, ch. 329, §§ 1-2 | https://heinonline.org/HOL/P?h=hein.ssl/sswi0136&i=290 |
| Wyoming | 1890 | 1890 Wyo. Sess. Laws 140, § 97 | https://heinonline.org/HOL/P?h=hein.ssl/sswy0076&i=138 |