No. 23-2275

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

Steven Robert Brown, et al.,

*Plaintiffs-Appellees*,

v.

Bureau of Alcohol, Tobacco, Firearms and Explosives, et al.,
*Defendants-Appellants.*

_____

On Appeal from the United States District Court
for the Northern District of West Virginia
(No. 1:22-cv-00080-TSK) (Hon. Thomas S. Kleeh, Chief Judge)

_____

**BRIEF OF EVERYTOWN FOR GUN SAFETY
AS AMICUS CURIAE IN SUPPORT OF THE
DEFENDANTS-APPELLANTS AND REVERSAL**

_____

Janet Carter
William J. Taylor, Jr.
Eleuthera O. Sa
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10163
(646) 324-8215
wtaylor@everytown.org

*Counsel for amicus curiae*
*Everytown for Gun Safety*

January 29, 2024

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................1

ARGUMENT ....................................................................................................2

I.    Plaintiffs Have Not Met Their Burden to Establish that 18-to-20-Year-Olds Fall Within the Second Amendment's Text ................................................2

II.   The Federal Age Restriction Is Consistent with this Nation's History of Firearms Regulation ..................................................................................7

      a.   The Federal Age Restriction Is Grounded in Centuries of Regulatory Tradition ............................................................................................8

      b.   If This Court Chooses To Address the Question, the Most Relevant Time Period for Historical Analysis Is the Reconstruction Era..........14

CONCLUSION ............................................................................................26

# TABLE OF AUTHORITIES

## CASES

*Antonyuk v. Chiumento,*
 89 F.4th 271 (2d Cir. 2023)..................................................... 4, 13, 15, 17

*District of Columbia v. Heller,*
 554 U.S. 570 (2008) ......................................................................*passim*

*Ezell v. City of Chicago,*
 651 F.3d 684 (7th Cir. 2011).........................................................16, 19

*Gould v. Morgan,*
 907 F.3d 659 (1st Cir. 2018) ................................................................16

*Hirschfeld v. ATF,*
 5 F.4th 407 (4th Cir. 2021), *vacated as moot,* 14 F.4th 322 (4th Cir. 2021) ...........5

*Jones v. Bonta,*
 No. 3:19-cv-01226, 2023 WL 8530834 (S.D. Cal. Dec. 8, 2023).....................6, 12

*Kanter v. Barr,*
 919 F.3d 437 (7th Cir. 2019)...........................................................10, 11

*Kipke v. Moore,*
 No. 1:23-cv-01293, 2023 WL 6381503 (D. Md. Sept. 29, 2023) ........................18

*Lara v. Comm'r Pa. State Police,*
 --- F.4th ----, No. 21-1832, 2024 WL 189453 (3d Cir. Jan. 18, 2024) ...........7, 8, 18

*Lindenau v. Alexander,*
 663 F.2d 68 (10th Cir. 1981).................................................................6

*Maryland Shall Issue, Inc. v. Moore,*
 86 F.4th 1038 (4th Cir. 2023), *reh'g en banc granted,* 2024 WL 124290 (4th Cir.
 Jan. 11, 2024) ...................................................................................6

*McDonald v. City of Chicago,*
 561 U.S. 742 (2010) ..........................................................................15

*McIntyre v. Ohio Elections Comm'n,*
514 U.S. 334 (1995) .......................................................................... 13

*Md. Shall Issue, Inc. v. Montgomery Cnty.,*
No. 8:21-cv-01736, 2023 WL 4373260 (D. Md. July 6, 2023), *appeal docketed,*
No. 23-1719 (4th Cir. July 10, 2023) ................................................ 18

*Nat'l Rifle Ass'n v. Bondi,*
61 F.4th 1317 (11th Cir. 2023), *vacated on grant of reh'g en banc,* 72 F.4th 1346
(11th Cir. 2023) ......................................................................... 17, 19

*New Jersey v. T.L.O.,*
469 U.S. 325 (1985) .......................................................................... 7

*New York State Rifle & Pistol Ass'n v. Bruen,*
597 U.S. 1 (2022) ................................................................... *passim*

*Perpich v. Dep't of Def.,*
496 U.S. 334 (1990) .......................................................................... 7

*Presser v. Illinois,*
116 U.S. 252 (1886) .......................................................................... 6

*Range v. Att'y Gen.,*
69 F.4th 96 (3d Cir. 2023) (en banc), *pet'n for cert. filed,* No. 23-374
(Oct. 5, 2023) .................................................................................. 8

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
393 U.S. 503 (1969) .......................................................................... 7

*United States v. Alaniz,*
69 F.4th 1124 (9th Cir. 2023) ........................................................... 2

*United States v. Greeno,*
679 F.3d 510 (6th Cir. 2012) .......................................................... 16

*United States v. Jackson,*
69 F.4th 495 (8th Cir. 2023), *pet'n for cert. filed,* No. 23-6170 (Dec. 6, 2023) .... 11

*United States v. Meyer,*
No. 4:22-cr-10012, 2023 WL 3318492 (S.D. Fla. May 9, 2023) .......................... 22

*United States v. Sitladeen*,
   64 F.4th 978 (8th Cir. 2023)................................................................3

*United States v. Sloat*,
   No. 3:22-cr-30017, 2023 WL 8455112 (S.D. Ill. Dec. 6, 2023) ...........10

*We the Patriots, Inc. v. Lujan Grisham*,
   No. 1:23-cv-00771, 2023 WL 6622042 (D.N.M. Oct. 11, 2023), *appeal docketed*,
   No. 23-2166 (10th Cir. Oct. 20, 2023) ...............................................18

## OTHER AUTHORITIES

1 John Bouvier, *Institutes of American Law* (1858) ...................................4

1 William Blackstone, *Commentaries on the Laws of England* (1st ed. 1765) ..........4

2 James Kent, *Commentaries on American Law* (1827) .............................4

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) ......22, 23

Brief for Independent Institute as Amicus Curiae, *New York State Rifle & Pistol
   Ass'n v. Bruen*, No. 20-843 (U.S.).......................................................24

Brief for the United States, *United States v. Rahimi*, No. 22-915 (U.S. Aug. 14,
   2023), 2023 WL 5322645 .................................................................9

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13
   Charleston L. Rev. 205 (2018) ..........................................................24

Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1
   (2022)........................................................................................20

Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or
   Immunities, the Constitution in 2020, and Properly Extending the Right to Keep
   and Bear Arms to the States*, 8 Geo. J.L. & Pub. Pol'y 1 (2010) ...................19, 20

Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan.
   15, 2021) (now published at 97 Ind. L.J. 1439),
   https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 ....................22, 23

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97

Ind. L.J. 1439 (2022)........................................................................21

Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45
San Diego L. Rev. 729 (2008) ..........................................................20

National Constitution Center, *W. Va. State Bd. of Educ. v. Barnette (1943)*, constitutioncenter.org/the-constitution/supreme-court-case-library/west-virginia-board-of-education-v-barnette ...............................................................7

Reply Brief for the United States, *United States v. Rahimi*, No. 22-915 (Oct. 25, 2023), 2023 WL 7106695.........................................................................9

Saul Cornell, *"Infants" and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record*, 40 Yale L. & Pol'y Rev. Inter Alia 1 (2021)..............................................................................................5, 6

Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*,
56 Buff. L. Rev. 655 (2008)...............................................................20

Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7 (2008)..20

Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S. Nov. 3, 2021) ..................................................................19

Transcript of Oral Argument, *United States v. Rahimi*, No. 22-915 (U.S. Nov. 7, 2023) ...................................................................................................9

## INTEREST OF AMICUS CURIAE

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund; hereafter "Everytown") is the nation's largest gun-violence-prevention organization, with over ten million supporters across the country. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a 20-year-old gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high-school and college students working to end gun violence.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

The federal restrictions on handgun purchase by 18-to-20-year-olds are constitutional under the approach to Second Amendment cases set out in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), for the reasons the defendants-appellants set out in their brief. *See* Dkt. 19 ("ATF Br."). Everytown submits this amicus brief to expand on two points. *First*, Plaintiffs have the burden

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission. All parties consent to this brief's submission.

on the initial, textual inquiry of the *Bruen* framework to show that the regulation they challenge implicates the Second Amendment's text. Because the historical evidence shows that those under 21 were considered infants, rather than adult members of the polity, Plaintiffs have not met this burden. *Second*, if this Court does proceed to the historical inquiry, it should conclude that the challenged restrictions are consistent with historical tradition. This is true regardless of whether the Court focuses on the founding or Reconstruction era, but if this Court reaches the question, it should center its analysis on 1868, when the Fourteenth Amendment was ratified, while also recognizing that both earlier and later history are also relevant.

## ARGUMENT

### I.     Plaintiffs Have Not Met Their Burden to Establish that 18-to-20-Year-Olds Fall Within the Second Amendment's Text

*Bruen*'s framework requires both a textual inquiry and a historical inquiry. A court first must ask "whether the challenger is 'part of "the people" whom the Second Amendment protects,'" whether the item at issue is an "arm" that is "'in common use' today for self-defense," and "whether the 'proposed course of conduct' falls within the Second Amendment." *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) (quoting *Bruen*, 597 U.S. at 32). If so, the court then moves on to ask whether the government has shown that its regulation is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.

2

*See generally id.* at 31-38 (separating application of test into Part III.A (text) and Part III.B (history)). If not, the inquiry ends: self-evidently, if the people, weapons, or conduct at issue are outside the Second Amendment's protection, then the government may regulate them without infringing the Second Amendment. *See, e.g., United States v. Sitladeen*, 64 F.4th 978, 987 (8th Cir. 2023) (rejecting defendant's Second Amendment challenge to indictment and plea under 18 U.S.C. § 922(g)(5)(A) without proceeding to historical inquiry because "the law of our circuit is that unlawful aliens are not part of 'the people' to whom the protections of the Second Amendment extend").

Plaintiffs have the burden on the initial, textual inquiry; the government's burden to show consistency with historical tradition arises only *after* the plaintiffs have carried their burden. *Bruen* itself makes that clear, by indicating that a presumption that the Constitution protects a plaintiff's conduct arises after ("when" or "because") the textual inquiry is satisfied. *See* 597 U.S. at 17, 44 n.11. If the burden were on the government throughout—in what would be an unusual departure from ordinary principles of constitutional litigation—the Court would have said so.

Plaintiffs have failed to carry this burden. Under *Heller* and *Bruen*, a court's textual analysis should focus on the "'normal and ordinary' meaning of the Second Amendment's language," as "confirmed by the historical background of the Second Amendment." *Bruen*, 597 U.S. at 20 (quoting *District of Columbia v. Heller*, 554

U.S. 570, 576-77, 592 (2008)); *see Heller*, 554 U.S. at 581-86 (reviewing 17th-, 18th-, and 19th-century sources to determine meaning of "keep and bear arms"); *Antonyuk v. Chiumento*, 89 F.4th 271, 300 (2d Cir. 2023) (noting that, at *Bruen*'s first step, courts are to "interpret[] the plain text of the [Second] Amendment as historically understood"). Below, Plaintiffs offered no persuasive historical evidence that the Second Amendment's reference to "the people" was understood to protect individuals under age 21.

History shows that the original meaning of the term "people" referred to *adult* members of the polity, which excluded individuals under 21. Those under 21 were considered minors or "infants" lacking sufficient judgment and ability to protect themselves, and thus they did not enjoy the full range of civil and political rights. *See* 1 William Blackstone, *Commentaries on the Laws of England*, 451 (1st ed. 1765) (individuals are "infant[s]" under law until age 21); *id.* at 452-54 (infants faced legal limitations to prevent them "from hurting themselves by their own improvident acts"); *id.* at 441 (individuals are "enfranchised" at the age of 21 "by arriving at years of discretion" and entering "the empire of reason"); 2 James Kent, *Commentaries on American Law* 101 (1827) (infants lacked a range of legal rights due to inability to "take care of themselves"); 1 John Bouvier, *Institutes of American Law* 137-38 (1858) (due to concerns that infants lacked appropriate "moral faculties," "strength," and "intelligence," individuals did not "acquire fully all their political civil rights"

until the age of 21). And historical research and analysis by a leading Second Amendment historian confirms that those few legal rights did not include a right to keep and bear arms. *See* Saul Cornell, *"Infants" and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record*, 40 Yale L. & Pol'y Rev. Inter Alia 1, 1-2 (2021) (explaining that, understood historically, the Second Amendment does not protect "a right of infants, meaning those under twenty-one, to keep and bear arms"). Given this historical background, it is unsurprising that when Justice Alito stressed that the Court's decision in *Bruen* did "not expand the categories of people who may lawfully possess a gun," he added with no hint of disapproval that "federal law ... bars the sale of a handgun to anyone under the age of 21." *Bruen*, 597 U.S. at 73 (Alito, J., concurring).

The district court's contrary conclusion was erroneous. It invoked two now-vacated decisions of this Court, based on which it concluded that law-abiding 18-to-20-year-olds "are part of 'the people' who[m] the Second Amendment protects." J.A. 58-60 & 58 n.7 (citing *Hirschfeld v. ATF*, 5 F.4th 407, 421-24 (4th Cir. 2021), *vacated as moot*, 14 F.4th 322, 328 (4th Cir. 2021), and *Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1043 n.5 (4th Cir. 2023), *reh'g en banc granted*, 2024 WL

124290 (4th Cir. Jan. 11, 2024)). But that disregards the compelling evidence that earlier generations did not understand "the people" that way. *See supra* pp. 3-5.

Moreover, the district court incorrectly concluded that the plaintiffs had carried their burden at the textual step in part by relying on early militia laws. J.A. 63-64. But *Heller* disconnected the Second Amendment right from militia service, 554 U.S. at 582-619; legislatures could (and several did) exclude those under 21 from service; and, in any event, laws imposing a duty to serve in the militia did not create an individual right to do so or establish an entitlement to Second Amendment rights. *See* Cornell, *supra*, at 14-16; ATF Br. 17-20; *see also Jones v. Bonta*, No. 3:19-cv-01226, 2023 WL 8530834, at *7-11 (S.D. Cal. Dec. 8, 2023) (rejecting "proposition that militia service for individuals under the age of 21 equates to a general right to independently commercially acquire firearms for individual use for any purpose").[2]

The district court also recounted other constitutional provisions, including the First and Fourth Amendments, that reference "the people" but apply to those under

---

[2] Even though there is a duty to serve in the military if drafted, "[i]t is well established that there is no right to enlist in this country's armed services." *Lindenau v. Alexander*, 663 F.2d 68, 72 (10th Cir. 1981). The Supreme Court made that clear in the militia context almost 150 years ago. *See Presser v. Illinois*, 116 U.S. 252, 267 (1886) (holding that participation in a non-government-organized militia "cannot be claimed as a right independent of law"). And it reaffirmed that principle in *Heller*, explaining that "weapons ... most useful in military service," which are not typically possessed by law-abiding citizens for lawful purposes, fall outside of the Second Amendment's scope, *see* 554 U.S. at 627-28, even though the government may

21. J.A. 56-58. But this argument has no lower limit, and thus carries the absurd consequence that the Second Amendment would cover very young children. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 504 (1969) (challengers aged 13, 15, and 16); National Constitution Center, *W. Va. State Bd. of Educ. v. Barnette (1943)*, constitutioncenter.org/the-constitution/supreme-court-case-library/west-virginia-board-of-education-v-barnette (Barnette sisters were 8 and 11 years old); *New Jersey v. T.L.O.*, 469 U.S. 325, 328 (1985) (14-year-old challenger).

For these reasons, Plaintiffs have not met their burden to show that the Second Amendment's protection extends to 18-to-20-year-olds, and the district court erred in concluding otherwise.[3]

## II.   The Federal Age Restriction Is Consistent with this Nation's History of Firearms Regulation

Plaintiffs' failure to meet their burden at the textual step should end the case. However, if the Court proceeds to the second, historical inquiry, it may confront the

---

mandate their use in the military or militia. Moreover, when the Supreme Court analyzed the early history of the Militia Act of 1792, it observed that the Act's "command that every able-bodied male citizen between the ages of 18 and 45 be enrolled therein and equip himself with appropriate weaponry was virtually ignored for more than a century, during which time the militia proved to be a decidedly unreliable fighting force." *Perpich v. Dep't of Def.*, 496 U.S. 334, 341 (1990) (footnote omitted).

[3] The Third Circuit recently took a different approach in *Lara v. Comm'r Pa. State Police*, --- F.4th ---, No. 21-1832, 2024 WL 189453 (3d Cir. Jan. 18, 2024), holding that 18-to-20-year-olds are among "the people" the Second Amendment protects and invalidating Pennsylvania's age restriction on carrying firearms. *Id.* at *4-6. That conclusion was based in part on prior circuit caselaw, *see Range v. Att'y*

7

question of the appropriate time period for that inquiry. This Court need not resolve that issue in this case, because regulatory tradition from the founding through the 19th century (and beyond) supports the federal restriction. But if it chooses to resolve the issue, it should conclude that the most relevant time period centers around 1868, when the people ratified the Fourteenth Amendment, made the Second Amendment applicable to the states, and thereby updated the meaning of the right as applied to the federal government.

### a. The Federal Age Restriction Is Grounded in Centuries of Regulatory Tradition

The federal age restriction is entirely consistent with the American tradition of firearms regulation regardless of what period this Court focuses on. *See* ATF Br. 8-17. To begin with, the Supreme Court has repeatedly described Second Amendment rights, as historically understood, as applicable to "law-abiding, *responsible* citizens." *Heller*, 554 U.S. at 635 (emphasis added). For example, *Bruen* stressed that its analysis cast no constitutional doubt on state carry-licensing regimes that do not require special need and thus "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry."

---

*Gen.*, 69 F.4th 96, 98 (3d Cir. 2023) (en banc), *pet'n for cert. filed,* No. 23-374 (Oct. 5, 2023), and in part on the panel's desire to maintain consistency with age-related principles in other constitutional rights. *See Lara*, 2024 WL 189453, at *5. This Court should not follow *Lara* for the reasons set out above, and the Commissioner has announced his intention to seek rehearing en banc, *see Lara*, No. 21-1832, Dkt. 79 (4th Cir. Jan. 23, 2024).

597 U.S. at 38 n.9 (quoting *Heller*, 554 U.S. at 635)). It added that such regimes are "designed to ensure only that those bearing arms ... are, in fact, 'law-abiding, responsible citizens.'" *Id.* (quoting same). The logical conclusion is that the Court read the historical materials as allowing a legislature to prevent those who are *not* "law-abiding, responsible citizens" from keeping and bearing arms; after all, it would not have generally approved licensing regimes with features "designed to ensure" that those are the only people carrying arms unless limiting the keeping and bearing of arms to such people were constitutional. *See generally* Br. for the United States, *United States v. Rahimi*, No. 22-915, 2023 WL 5322645, at *11-27 (U.S. Aug. 14, 2023) (explaining that history and Supreme Court decisions establish an "enduring principle" that the "Second Amendment allows [legislatures] to disarm individuals who are not law-abiding, responsible citizens"); Reply Br. for the United States, *Rahimi*, No. 22-915, 2023 WL 7106695, at *2-3 (Oct. 25, 2023) (same); Tr. of Oral Arg. at 10:6-11:23, *Rahimi* (No. 22-915) (Solicitor General, explaining that "responsible" carves out "those whose possession of firearms presents an unusual danger beyond the ordinary citizen," including those who "might not intend to be dangerous," such as "minors"); *id.* at 4:13-20 (Solicitor General, explaining that "[t]hroughout our nation's history, legislatures have disarmed those ... whose access to guns poses a danger, for example, loyalists, rebels, minors, individuals with mental illness, felons, and drug addicts"); *see also United States v. Sloat*, No. 3:22-cr-30017,

2023 WL 8455112, at *3-6 & nn.3-7 (S.D. Ill. Dec. 6, 2023) (recognizing an "enduring principle" that "[l]egislatures may disarm those who are not law-abiding, responsible citizens," including "minors," based in part on arguments in United States's *Rahimi* brief).

In line with this principle, the Supreme Court has also recognized that legislatures may take a categorical approach to regulating access to firearms by those who are not law-abiding or responsible. *Heller*, 554 U.S. at 626 (approving firearm restrictions on "felons and the mentally ill"). Justice Barrett reached a similar conclusion in a dissenting opinion she authored when serving as a Seventh Circuit judge. She noted that *Heller* "endorses the proposition that the legislature can impose some categorical bans on the possession of firearms," and examined founding-era sources and determined that legislatures "categorically disarmed groups whom they judged to be a threat to the public safety." *Kanter v. Barr*, 919 F.3d 437, 454, 458 (7th Cir. 2019) (Barrett, J., dissenting); *see also id.* at 451 ("In 1791 ... legislatures disqualified categories of people from the right to bear arms only when they judged that doing so was necessary to protect the public safety."); *id.* at 464 ("History ... support[s] the proposition that the state can take the right to bear arms away from a category of people that it deems dangerous."); *United States v. Jackson*, 69 F.4th 495, 504 (8th Cir. 2023) ("Legislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented

an unacceptable risk of danger if armed."), *pet'n for cert. filed*, No. 23-6170 (Dec. 6, 2023).

That is precisely the judgment the federal government made when it restricted the ability of those 18 to 20 to purchase firearms from federally licensed dealers. Considered as a category, individuals under 21 simply present too great a risk of harm—to themselves or others—when armed with a gun. As Blackstone observed, they lack sufficient "discretion" and "reason" to possess full rights. *See supra* pp. 4-5. To use *Bruen*'s parlance, they are not "responsible"; to use then-Judge Barrett's, they are "deem[ed] dangerous" or "judged to be a threat to the public safety" when armed.[4] Accordingly, the founding-era history underlying *Bruen*'s "responsible" principle and then-Judge Barrett's "threat to the public safety" principle permits the government to limit the ability of individuals in this group to access or use arms.

Reconstruction-era historical materials reflect and confirm the conclusion that individuals under 21 are a category of irresponsible people that the legislature may disarm. In that era, myriad state laws restricted the ability of those under 21 to access or use firearms. *See* ATF Br. 13-16; *see also id.* at 15 (discussing influential

----

[4] It is no answer for Plaintiffs to try to establish that they, as individuals, are unusually responsible and do not present the same risk of harm when armed as a typical 18-to-20-year-old. To reiterate, as then-Judge Barrett recognized, "[h]istory support[s]" a legislature's ability to disarm "a *category* of people that it deems dangerous." *Kanter*, 919 F.3d at 464 (Barrett, J., dissenting) (emphasis added). Proceeding categorically will always involve the possibility of under- and over-inclusivity. But if history supports that approach, then so does *Bruen*.

Reconstruction-era treatise, cited in *Heller*, that confirmed government's ability to prohibit sale of arms to those under 21); *id.* at 15-16 (discussing absence of constitutional challenges to historical age restrictions aside from decision *upholding* challenged law).

In sum, both founding-era and Reconstruction-era history demonstrate that federal law is consistent with this Nation's history of firearms regulation. *See generally Jones*, 2023 WL 8530834, at *7-11 (concluding, based on 18th- and 19th-century history, that state had provided sufficient historical analogues for under-21 age restriction on sale and transfer of certain firearms). Because the inquiry into the public understanding in 1791 and 1868 yield the same result, the Court need not decide which is the most relevant time period. *See Bruen*, 597 U.S. at 37-38.

Moreover, even if this Court were to conclude that 1791 is the correct focus and find the evidence in that era lacking, it should look to 19th-century and later evidence to contextualize earlier legislative inaction. For instance, if a regulation passed in the decades around Reconstruction—*within the lifetimes* of some who were alive at the founding—did not raise a constitutional challenge at the time of its passage, and there is no separate historical evidence showing that the regulation would have raised constitutional concern in the decades prior, then it can be inferred that the regulation comports with the founding-era public understanding of the right. In other words, absent affirmative evidence to the contrary, a court should presume

12

that a Reconstruction-era or later public understanding of the right (as demonstrated through a regulatory tradition or other historical materials from that period) also reflects the founding-era understanding.

Here, 19th-century laws are convincing evidence of how the right was understood not only when they were passed, but also in earlier decades. Plaintiffs have provided no reason to believe that the understanding of the right of those under 21 to keep and bear arms underwent some startling transformation between 1791 and 1868 (or 1900). *Cf. McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 375 (1995) (Scalia, J., dissenting) ("Principles of liberty fundamental enough to have been embodied within constitutional guarantees are not readily erased from the Nation's consciousness."); *Antonyuk*, 89 F. 4th at 304 (finding it "implausible" that "public understanding would promptly dissipate whenever [one] era gave way to another").[5] The district court discounted an abundance of 19th-century laws because, in its view, they "contradict[ed]" founding-era evidence. J.A. 62-63. That was incorrect. The founding-era tradition of disarming "dangerous" people and the

---

[5] Such a presumption also reflects and reinforces the Supreme Court's position that "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Bruen*, 597 U.S at 37. For the Supreme Court—which emphasized the importance of original public understanding—to take this position, it must have presumed, at least as a general matter, that constitutional rights maintained a consistent meaning between the two points of their adoption, 1791 and 1868.

13

evidence that so-called "infants" did not enjoy Second Amendment rights strongly support the federal age restrictions. *See* ATF Br. 11-13; *supra* pp. 3-5. And the compelling Reconstruction-era tradition of regulation confirms the enduring principle that a legislature acts constitutionally when it determines that those under 21 pose a particular risk of harm when they keep or bear arms, and restricts their ability to do so.[6]

### b. If This Court Chooses To Address the Question, the Most Relevant Time Period for Historical Analysis Is the Reconstruction Era

If this Court wishes to resolve the issue *Bruen* left open as to the most relevant time period, it should hold that the inquiry centers on 1868. To begin with, in a case challenging the constitutionality of a state law, focusing on 1868 is the only way to answer the originalist question: How did the people understand the right at the time of its adoption? The U.S. Constitution's protection of the right to keep and bear arms did not constrain the states until 1868; as *Bruen* correctly observed, a state "is bound to respect the right to keep and bear arms because of the Fourteenth

---

[6] Plaintiffs suggested below that various Supreme Court cases have "made clear that with respect to the federal government, 1791 is the proper period to examine to determine the original meaning of the various provisions in the Bill of Rights." Pls.' MTD Response at 9-10, No. 1:22-cv-00080, Dkt. 29 (N.D.W. Va. Jan. 3, 2023). But those cases did not address the significance of the Fourteenth Amendment's ratification for the question of which time period (Reconstruction or founding) is most relevant to the historical inquiry, and, like the other cases *Bruen* cited, cannot have resolved the issue that *Bruen* expressly left open. *See Bruen*, 597 U.S. at 37-38.

Amendment, not the Second." 597 U.S. at 37. Thus, when the people chose to extend the Bill of Rights to the states in 1868, *their* understanding of the scope of each right at that time should control the originalist analysis today. In a case against a state, to elevate a founding-era understanding of the right over the Reconstruction-era understanding would be to reject what the people understood the right to be at the time they gave it effect. And that, in turn, would violate the originalist mandate of *Heller* and *Bruen*: "'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*'" *Bruen*, 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634-35) (emphasis added in *Bruen*).

Insisting that the 1791 understanding should apply against the states does not make sense in light of the Supreme Court's lengthy analysis in *McDonald* of the understanding of the right to keep and bear arms around 1868. *See McDonald v. City of Chicago*, 561 U.S. 742, 770-78 (2010) (plurality opinion); *id.* at 826-38 (Thomas, J., concurring in part and concurring in the judgment). As the Second Circuit recognized, "[i]t would be incongruous to deem the right to keep and bear arms fully applicable to the States by Reconstruction standards but then define its scope and limitations exclusively by 1791 standards." *Antonyuk*, 89 F. 4th at 305. That is presumably why the Seventh Circuit, in a pre-*Bruen* opinion by Judge Sykes, read *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the

15

Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011).

Several other circuits reached the same conclusion in analyzing the tradition of firearm regulation at the first, historical step of the pre-*Bruen* Second Amendment framework.[7] *See United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *Gould*, 907 F.3d at 669 ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified)."). *Bruen* does not alter that conclusion; the step-one analyses in these cases remain, as a general matter, good law. *See* 597 U.S. at 37-38 (leaving open the question whether 1868 or 1791 is the correct focus); *id.* at 19 (concluding that "[s]tep one of the predominant framework [applied in the lower courts before *Bruen*] is broadly consistent with *Heller*").

The Second Circuit recently held that, where the case before it challenged "a state law, the prevailing understanding of the right to bear arms in 1868 and

---

[7] Between *Heller* and *Bruen*, every federal court of appeals to address the issue concluded that analyzing Second Amendment claims should proceed in two steps: a historical step, in which courts examined whether the challenged law restricted conduct falling within the scope of the Second Amendment, as historically understood; and, if so, a means-end scrutiny step, where courts examined the fit between the government's interest and the challenged law, usually under intermediate scrutiny. *See Bruen*, 597 U.S. at 18-19; *Gould v. Morgan*, 907 F.3d 659, 668 (1st Cir. 2018) (citing cases), *criticized by Bruen*, 597 U.S. at 14, 17-18.

1791 are both focal points of our analysis." *Antonyuk*, 89 F. 4th at 304. A panel of the Eleventh Circuit similarly held that, in cases involving state laws, where the understanding of the right to keep and bear arms differs between the founding and Reconstruction eras, "the more appropriate barometer is the public understanding of the right when the States ratified the Fourteenth Amendment and made the Second Amendment applicable to the States." *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1323 (11th Cir. 2023), *vacated on grant of reh'g en banc*, 72 F.4th 1346 (11th Cir. 2023). Although that panel opinion has now been vacated for rehearing en banc, its analysis of the relevant time period remains consistent with originalist principles. *See Antonyuk*, 89 F.4th at 305 (following *Bondi*). As the panel explained:

> This is necessarily so if we are to be faithful to the principle that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." As with statutes, when a conflict arises between an earlier version of a constitutional provision (here, the Second Amendment) and a later one (here, the Fourteenth Amendment and the understanding of the right to keep and bear arms that it incorporates), "the later-enacted [provision] controls to the extent it conflicts with the earlier-enacted [provision]." ... The opposite rule would be illogical.

61 F.4th at 1323-24 (alterations in original) (citations omitted). Other courts have agreed. *See Md. Shall Issue, Inc. v. Montgomery Cnty.*, No. 8:21-cv-01736, 2023 WL 4373260, at *8 (D. Md. July 6, 2023) (concluding that "historical sources from the time period of the ratification of the Fourteenth Amendment are equally if not

17

more probative of the scope of the Second Amendment's right to bear arms as applied to the states by the Fourteenth Amendment"), *appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023); *Kipke v. Moore*, No. 1:23-cv-01293, 2023 WL 6381503, at \*6 (D. Md. Sept. 29, 2023) (agreeing with *Maryland Shall Issue*); *We the Patriots, Inc. v. Lujan Grisham*, No. 1:23-cv-00771, 2023 WL 6622042, at \*8 (D.N.M. Oct. 11, 2023) ("[T]he Court agrees with the Eleventh Circuit [in *Bondi*] … and the district court in *Maryland Shall Issue* that historical sources from the period of the ratification of the Fourteenth Amendment in 1868 are more probative of the scope of the Second Amendment's right to bear arms than those from the Founding Era."), *appeal docketed*, No. 23-2166 (10th Cir. Oct. 20, 2023).[8]

The conclusion that the 1868 understanding of the Second Amendment right should apply in a case against a state is far from radical. Indeed, it was the position former Solicitor General Paul Clement took as counsel for the NRA's New York affiliate during oral argument in *Bruen*:

> JUSTICE THOMAS: [Y]ou mentioned the founding and you mentioned post-Reconstruction. But, if we are to analyze this based upon the history or tradition, should we look at the founding, or should we look at the time of the

---

[8] The Third Circuit recently held that 1791 is the more relevant date in a case challenging Pennsylvania's age restriction on carrying firearms. *Lara*, 2024 WL 189453, at \*8-10. The court based its conclusion on a "general assumption" in several Supreme Court cases *Bruen* cited, not on originalist principles. *See id.* at \*7-8 (citing *Bruen*, 597 U.S. at 37). But, as explained above, those cases did not conclusively resolve the time-period question left open in *Bruen*. *See supra* note 6.

adoption of the Fourteenth Amendment, which then, of course, applies it to the states?

MR. CLEMENT: So, Justice Thomas, I suppose, if there were a case where there was a contradiction between those two, you know, and the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction ... and giving preference to that over the founding.

Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843).

It is also the position prominent scholars of originalist theory have taken.

"Many prominent judges and scholars—across the political spectrum—agree that, at a minimum, 'the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified.'" *Bondi*, 61 F.4th at 1322 n.9 (quoting *Ezell*, 651 F.3d at 702) (citing, among others, Josh Blackman, Ilya Shapiro, Steven Calabresi, and Sarah Agudo); *see also* Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 Geo. J.L. & Pub. Pol'y 1, 52 (2010) ("1868 is ... the proper temporal location for applying a whole host of rights to the states.... Interpreting the right to keep and bear arms as instantiated by the Fourteenth Amendment—based on the original public meaning in 1791—thus yields an inaccurate analysis." (footnote omitted)); Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7,

19

115-16 & 116 n.485 (2008) (asserting that "[Akhil] Amar is exactly right" that 1868

meaning controls); Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51

Hofstra L. Rev. 1, 23 (2022) (calling 1868 view "ascendant among originalists").

Others who have endorsed this view include Professors Michael Rappaport[9] and

Stephen Siegel.[10] In sum, originalist analysis compels applying the 1868

understanding of the right to keep and bear arms in a case challenging a state law.[11]

The pertinent question in this case, of course, is whether the 1868

understanding should also control in challenges to *federal* gun laws, to which the

Second Amendment applies directly rather than through the Fourteenth

Amendment. Again, this Court need not decide that issue here, because the federal

restrictions "reflect a historical tradition that stretches from the founding." ATF Br.

---

[9] Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729, 748 (2008).

[10] Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655, 662 n.32 (2008) ("I am unable to conceive of a persuasive originalist argument asserting the view that, with regard to the states, the meaning of the Bill in 1789 is to be preferred to its meaning in 1868.").

[11] To be clear, we do not suggest that each of these scholars also believe that 1868 is the correct focus for analyzing the public meaning of the right to keep and bear arms in cases against the federal government. Professors Blackman and Shapiro, for example, maintain that 1868 is the correct focus for cases against a state and 1791 is correct for cases against the federal government. *See* Blackman & Shapiro, 8 Geo. J.L. & Pub. Pol'y at 51. As discussed below, because *Bruen* subsequently seemed to reject the possibility of different standards for the state and federal governments, it appears that originalists must choose one period or the other, and the weight of authority and analysis favors 1868. *See infra* pp. 21-24.

7. If the Court decides to resolve the issue for future cases, however, it should conclude that 1868 is the correct focus in cases challenging both federal and state laws.

To be sure, the choice between 1791 and 1868 is a less straightforward one with respect to challenges to federal laws. If the public understanding of the Bill of Rights changed between ratification in 1791 and incorporation in 1868, then "[o]riginalists seem," at first glance, to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022). But *Bruen* seemed to reject the possibility of different standards for the state and federal governments. 597 U.S. at 37 ("[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government."). Accordingly, it appears that originalists must justify applying either the 1868 understanding or the 1791 understanding (where they conflict) to all levels of government.

Existing doctrine does not resolve this choice between 1791 and 1868: *Bruen* noted only that prior decisions had "assumed" that the scope for both state and

21

federal governments "is pegged to the public understanding ... in 1791." *Id.* If the majority believed those decisions controlled the issue, it would have said so. Instead, the Court expressly left open the question whether 1868 or 1791 is the relevant focus, and it pointed to "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id.* at 37-38. The Court then cited two scholars who support the 1868 view, Professors Akhil Amar and Kurt Lash, and none who supports the 1791 view. *See id.* (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439)); *see also, e.g., United States v. Meyer*, No. 4:22-cr-10012, 2023 WL 3318492, at *2 n.4 (S.D. Fla. May 9, 2023) (noting that "Justice Thomas, writing for the majority in *Bruen*, signaled an openness to the feedback-effect theory of the Fourteenth Amendment").

On Professor Amar's account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform their

meaning not only against the states, but also as to the federal government.[12] More recently, Professor Lash wrote—as quoted in *Bruen*—"When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." Lash, manuscript, at 2; *see Bruen*, 597 U.S. at 38. On this view, too, 1868 meanings bind both the states and the federal government.

The 1868 view is also consistent with the passage in *Bruen* instructing the lower courts on historical methodology through the example of sensitive-places restrictions. There, the Court indicated that "18th- *and 19th-century*" laws contained adequate restrictions on the possession of guns in legislative assemblies, polling places, and courthouses to satisfy its historical analysis, 597 U.S. at 30 (emphasis added)—an incomprehensible statement if the Court believed that the 18th century was the only relevant period. Notably, in the pages of the article and brief the Court

---

[12] *See* Amar, *The Bill of Rights*, *supra*, at xiv (noting that a "particular principle in the Bill of Rights may change its shape in the process of absorption into the Fourteenth Amendment"); *id.* at 223 ("[I]n the very process of being absorbed into the Fourteenth Amendment, various rights and freedoms of the original Bill may be subtly but importantly transformed[.]"); *id.* at 243 (arguing that "the Fourteenth Amendment has a doctrinal 'feedback effect' against the federal government"); *see also id.* at 283 ("[W]ords inserted into the Constitution in 1791 must be read afresh after 1866.").

cited for that proposition, *see id.*, all of the 19th-century laws restricting guns in any of the three locations the Court listed were from the *late* 19th century.[13]

Further, while any historical inquiry this Court conducts should focus on the period around 1868, that date is neither a starting-line nor a cutoff. *Heller* and *Bruen* both examined history preceding even 1791, *see Heller*, 554 U.S. at 592-93; *Bruen*, 597 U.S. 34-35, 44-50, and *Heller* instructs that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation," 554 U.S. at 605 (second emphasis added); *see also Bruen*, 597 U.S. at 20 (quoting same). *Bruen* clarified that, under this passage in *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 597 U.S. at 36, 66 n.28. But it emphasized that, conversely, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 35-36 (cleaned up) (quoting decision quoting James Madison). Thus, regardless of which period (founding or Reconstruction) this Court

---

[13] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana law, 1874 and 1886 Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia law); Br. for Indep. Inst. as Amicus Curiae at 11-17, *Bruen* (No. 20-843) (July 20, 2021) (disputing relevance of 19th-century laws but (at 16 n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

24

determines to be the most relevant, it should look to "practice" thereafter to "settle" the meaning of the right and demonstrate that the challenged restrictions are constitutional.

In short, to ensure that its interpretation of the right to keep and bear arms accords with the people's original understanding, this Court should train any historical inquiry on the period around 1868. And, in any event, regardless of whether the Court concludes that the relevant focus for its analysis is 1791 or 1868, it should consider this later historical evidence and the "regular course of practice" in the decades that followed to "settle" the meaning of the right as one that allows for restrictions like those challenged here.

## CONCLUSION

This Court should reverse the district court's judgment.

Respectfully submitted,

Dated: January 29, 2024

/s/ William J. Taylor, Jr.

Janet Carter
William J. Taylor, Jr.
Eleuthera O. Sa
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10163
wtaylor@everytown.org
(646) 324-8215

*Counsel for amicus curiae*
*Everytown for Gun Safety*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) because this brief contains 6,496 words, excluding the portions exempted by Fed. R. App. P. 32(f), and complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

/s/ William J. Taylor, Jr.
William J. Taylor, Jr.
*Counsel for amicus curiae*
*Everytown for Gun Safety*

## CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2024, I electronically filed this amicus brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

/s/ William J. Taylor, Jr.
William J. Taylor, Jr.
*Counsel for amicus curiae*
*Everytown for Gun Safety*