**No. 23-2275**

## In the
## United States Court of Appeals
## for the Fourth Circuit

STEVEN ROBERT BROWN, et al.,

*Plaintiffs-Appellees*,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of West Virginia
No. 1:22-cv-00080-TSK

**APPELLEES' BRIEF**

Adam J. Kraut
SECOND AMENDMENT FOUNDATION
12500 N.E. 10th Place
Bellevue, WA 98005
(800) 426-4302
akraut@saf.org

David H. Thompson
Peter A. Patterson
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Ave NW
Washington, DC 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com

*Counsel for Appellees*

February 21, 2024

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................... ii

INTRODUCTION ......................................................................................1

JURISDICTIONAL STATEMENT .............................................................2

STATEMENT OF ISSUES .........................................................................2

STATEMENT OF THE CASE .....................................................................2

SUMMARY OF ARGUMENT ....................................................................5

ARGUMENT ..............................................................................................8

I.    The Second Amendment's Plain Text Covers Plaintiffs' Rights to Purchase Firearms. .......................................................................9

    A.  The Second Amendment Protects the Right to Purchase Firearms.......................................................................................9

    B.  The Second Amendment Applies to 18-to-20-Year-Olds. .............15

II.    The Handgun Purchase Ban Cannot Be Justified By Reference to Any Historical Firearms Regulations. ...............................................23

    A.  The Unanimous Practice of the Founding Era Was to Permit 18-to-20-Year-Olds to Exercise Their Second Amendment Rights on Equal Footing with Older Americans...........................................26

    B.  Reconstruction Era History Confirms That 18-to-20-Year-Olds Have Full Firearm Rights.............................................................32

III.    The District Court Did Not Err in Enjoining the Handgun Purchase Ban.......................................................................................41

CONCLUSION ........................................................................................43

REQUEST FOR ORAL ARGUMENT......................................................43

## TABLE OF AUTHORITIES

**Cases**                                                             **Page**

*Agostini v. Felton*,
521 U.S. 203 (1997)........................................................................25

*Andrews v. State*,
50 Tenn. 165 (1871) .....................................................................11

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015)........................................................................16

*Aymette v. State*,
21 Tenn. 154 (1840) ......................................................................38

*Brown v. Ent. Merchants Ass'n*,
564 U.S. 786 (2011)........................................................................30

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993)........................................................................13

*Crawford v. Washington*,
541 U.S. 36 (2004)..........................................................................25

*District of Columbia v. Heller*,
554 U.S. 570 (2008)...............................................................1, 8, 9, 10,
11, 12, 14, 15, 17, 18, 19, 21, 22, 23, 24, 29, 31, 38

*Eldred v. Ashcroft*,
537 U.S. 186 (2003)....................................................................19, 20

*Espinoza v. Mont. Dep't of Revenue*,
140 S. Ct. 2246 (2020)...................................................................34

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ...............................................10, 11, 42

*Fraser v. BATFE*,
2023 WL 5617899 (E.D. Va. Aug. 30, 2023) ..........................42, 43

*Hirschfeld v. BATFE*,
14 F.4th 322 (4th Cir. 2021) ..........................................................13

*Hirschfeld v. BATFE*,
5 F.4th 407 (4th Cir. 2021) .................... 13, 14, 16, 17, 21, 23, 27, 28, 33, 34

*Ill. Ass'n of Firearm Retailers v. City of Chicago*,
961 F. Supp. 2d 928 (N.D. Ill. 2014)..............................................11

ii

*Jackson v. City and Cnty. of San Francisco*,
　746 F.3d 953 (9th Cir. 2014) ...................................................................10, 11

*Jones v. Bonta*,
　34 F.4th 704 (9th Cir. 2022) ..................................... 18, 19, 20, 26, 34, 38, 42

*Jones v. Bonta*,
　47 F.4th 1124 (Mem.) (9th Cir. 2022)....................................................18, 19

*Kanter v. Barr*,
　919 F.3d 437 (7th Cir. 2019)..........................................................................31

*Lara v. Comm'r Pa. State Police*,
　91 F.4th 122 (3d Cir. 2024) ............................................................13, 24, 32

*Luis v. United States*,
　578 U.S. 5 (2016).............................................................................................10

*McCulloch v. Maryland*,
　17 U.S. 316 (1819)...........................................................................................11

*McDonald v. City of Chicago*,
　561 U.S. 742 (2010)....................................................................................25, 34

*Md. Shall Issue, Inc. v. Moore*,
　86 F.4th 1038 (4th Cir. 2023)..............................................................9, 10, 12

*Md. Shall Issue, Inc. v. Moore*,
　2024 WL 124290 (4th Cir. Jan. 11, 2024) .....................................................9

*Monsanto Co. v. Geertson Seed Farms*,
　561 U.S. 139 (2010)........................................................................................42

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
　597 U.S. 1 (2022).....................................................................1, 3, 8, 11, 15,
　16, 17, 23, 24, 25, 26, 29, 31, 32, 35, 36, 40, 41

*N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*,
　140 S. Ct. 1525 (2020)....................................................................................10

*Nat'l Rifle Ass'n of Am., Inc. v. BATFE*,
　700 F.3d 185 (5th Cir. 2012)....................................................................14, 39

*Nat'l Rifle Ass'n, Inc. v. BATFE*,
　714 F.3d 334 (5th Cir. 2013) ........................................ 23, 26, 31, 37, 40, 41

*Nat'l Rifle Ass'n, Inc. v. Bondi*,
　61 F.4th 1317 (11th Cir. 2023) .....................................................................37

*Nat'l Rifle Ass'n, Inc. v. Bondi*,
72 F.4th 1346 (Mem.) (11th Cir. 2023).......................................................37

*Nev. Comm'n on Gaming Ethics v. Carrigan*,
564 U.S. 117 (2011)...................................................................................25

*New Jersey v. T.L.O.*,
469 U.S. 325 (1985)...............................................................................16, 17

*Nunn v. State*,
1 Ga. 243 (1846)............................................................................10, 15, 16

*Page v. State*,
50 Tenn. 198 (1871) .................................................................................38

*Parker v. Dist. of Columbia*,
478 F.3d 370 (D.C. Cir. 2007)...................................................................19

*State v. Callicutt*,
69 Tenn. 714 (1878) .............................................................................37, 38

*Teixeira v. Cnty. of Alameda*,
873 F.3d 670 (9th Cir. 2017) ....................................................................10

*Terry v. Ohio*,
392 U.S. 1 (1968).......................................................................................13

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
393 U.S. 503 (1969)...................................................................................16

*United States v. Marzzarella*
614 F.3d 85 (3d Cir. 2010)...............................................................11, 14, 15

*United States v. Miller*,
307 U.S. 174 (1939)...................................................................................26

*United States v. Verdugo-Urquidez*,
494 U.S. 259 (1990)...................................................................................17

*Virginia v. Moore*,
553 U.S. 164 (2008)...................................................................................25

*W. Va. State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943)...................................................................................16

*Worth v. Harrington*,
666 F. Supp. 3d. 902 (D. Minn. 2023) ......................................................13

## **Constitutional Provisions, Statutes and Laws**

U.S. Const. amend. II.................................................................8

U.S. Const. art. I,
  § 2, cl. 2.........................................................................16
  § 8, cl. 16.......................................................................19

18 U.S.C.
  § 922(a)(1)(A)...................................................................3
  § 922(b)(1)......................................................................3
  § 922(c)(1)......................................................................3

27 C.F.R.
  § 478.99(b)(1)...................................................................3
  § 478.96(b)......................................................................3
  §478.124(a)......................................................................3
  §478.124(f)......................................................................3

The Militia Act of 1792, subd. ch. 33 § 1, 1 Stat. 271.............19

27 Stat. 116–17 (1892).............................................................33

1882 W. Va. Acts 421..............................................................35

16 Del. Laws 716 (1881) ....................................................35, 36

1856 Ala. Acts 17..............................................................34, 36

1856 Tenn. Public Acts 92...................................................34, 36

1876 Ga. Laws 112.................................................................36

1878 Miss. Laws 175..............................................................36

1881 Ill. Laws 73..............................................................35, 36

1882 Md. Laws 656..................................................................35

1883 Kan. Sess. Laws 159....................................................34, 36

1883 Wis. Sess. Laws 290....................................................35, 36

1884 Iowa Acts 86............................................................35, 36

1885 Nev. Stat. 51.................................................................34

1890 La. Acts 39..................................................................35

1890 Okla. Laws 495...............................................................36

1890 Wyo. Sess. Laws 1253 ..................................................33, 35

1893 N.C. Sess. Laws 468..........................................................36

1895 Neb. Laws 237–38, *Laws of Nebraska Relating to the City of Lincoln*, Art. XXVI, §§ 2, 5 ...................................................................35

1897 Tex. Gen. Laws 221 ...................................................................36

Edward Bullock & William Johnson*, The General Statutes of the Commonwealth of Kentucky* 359, § 1 (1873)......................................................34, 36

Mo. Rev. Stat. § 1274 (1879)..............................................................36

### **<u>Other Authorities</u>**

1 BLACKSTONE COMMENTARIES ....................................................28, 36

2 ANNALS OF CONGRESS (Joseph Gales ed., 1834)...............................20

HENDRIK BOORAEM, YOUNG HICKORY: THE MAKING OF ANDREW JACKSON 195 (2001), https://bit.ly/48uq2l3 ..............................................28, 29

JOHN BOUVIER, 1 INSTITUTES OF AMERICAN LAW (1851) .......................37

THOMAS M. COOLEY, THE GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA (1880)..............................................39

THOMAS M. COOLEY, TREATISE ON CONSTITUTIONAL LIMITATIONS (5th ed. 1883)...................................................................17, 37, 38

JOHN FAUCHEREAUD GRIMKE, THE SOUTH CAROLINA JUSTICE OF THE PEACE (1788)...................................32

SAMUEL JOHNSON, 1 DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 1773)...................................................................12, 15

David B. Kopel & Joseph G.S. Greenlee, *History and Tradition in Modern Circuit Cases on the Second Amendment Rights of Young People*, 43 S. ILL. LAW J. 119 (2018).........................................................39

David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U. L.J. 495 (2019)..................................21, 22, 27

Proceedings of the Common Council of the City of Chicago for the Municipal Year 1872–3 (1874)...................................................................35

*Sentiments on a Peace Establishment* (May 2, 1783), *reprinted in* 26 THE WRITINGS OF GEORGE WASHINGTON 389 (John C. Fitzpatrick, ed. 1938) ....................................................20

Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, Not 1868*, HARV. J. L. & PUB. POL'Y PER CURIAM, (Fall 2022), https://bit.ly/3uGTcQg...................................................................24

Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 TEX. REV. OF L. AND POLITICS 191 (2006).........................................................35

NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828)................................................................................12, 15

*What is Open Carry and Which States Allow It?*, U.S. CONCEALED CARRY (Nov. 14, 2023), https://bit.ly/3uGXAyI .......................................39

## INTRODUCTION

As a matter of plain text, the Second Amendment's protection extends to "all Americans," including law-abiding, 18-to-20-year-olds adult citizens. *See District of Columbia v. Heller*, 554 U.S. 570, 581, 592 (2008). And there is no historical tradition that would support restricting handgun sales to any "ordinary, law-abiding, adult citizens" on account of their age. *See N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 31 (2022). It follows that the challenged laws and regulations, which categorically bar 18-to-20-year-old adults from accessing the commercial market for handguns (the "Handgun Purchase Ban"), cannot pass constitutional muster.

Following these principles, the district court granted judgment in Plaintiffs' favor. The district court held that the acquisition of handguns by 18-to-20-year-old adults was conduct falling within the scope of the plain text of the Second Amendment and that there was no historical tradition of similar firearms regulation that satisfied the requirements of the test laid out in *Bruen*, 597 U.S. 1 (2022). This decision was correct. 18-to-20-year-olds are part of "the people" whose rights are secured by the Bill of Rights. And at the Founding, far from being forbidden from acquiring common arms for self-defense, they were *required* to arm themselves. The only laws that arguably *could* support the Handgun Purchase Ban come from 1856 at the earliest, far too late to overcome the overwhelming evidence from the

Founding, and the district court was correct to disregard them. And in any event, even by the end of the 19th century those laws were enacted in only a minority of the states, too few to establish a tradition that would limit the scope of Second Amendment rights. What is more, the vast majority of laws were directed at minority status, not any particular age, and therefore the laws cannot support a restriction on legal adults, regardless of age. The decision below should be affirmed.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because Plaintiffs brought claims arising under federal law. JA13. This Court has jurisdiction pursuant to U.S.C. § 1291, because this appeal is from a final judgment that disposed of all claims. JA69. The district court entered judgment on December 1, 2023, and the Government timely noticed this appeal on December 8, 2023. JA83.

## STATEMENT OF ISSUES

Whether federal law banning licensed dealers from selling handguns and handgun ammunition to law-abiding 18-to-20-year-old adults violates the Second Amendment to the United States Constitution.

## STATEMENT OF THE CASE

Plaintiffs challenge the constitutionality of statutes that were enacted as part of the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197, along with regulations promulgated to enforce those statutory provisions,

2

that together bar 18-to-20-year-olds from purchasing handguns from federal firearms licensees ("FFLs"). In particular, the Handgun Purchase Ban makes it unlawful for an FFL:

> to sell or deliver . . . any firearm or ammunition . . . if the firearm, or ammunition is other than a shotgun or rifle, or ammunition for a shotgun or rifle, to any individual who the licensee knows or has reasonable cause to believe is less than twenty-one years of age.

18 U.S.C. § 922(b)(1). Likewise, the Act prohibits FFLs from selling a firearm to a person "who does not appear in person at the licensee's business premises (other than another licensed importer, manufacturer, or dealer)" unless the person submits a sworn statement that "in the case of any firearm other than a shotgun or a rifle, [he or she is] twenty-one years or more of age." *Id.* § 922(c)(1). These statutes are implemented by regulations that similarly bar handgun sales to individuals under 21. *See* 27 C.F.R. §§ 478.99(b)(1), 478.96(b), & 478.124(a), (f).

As a result of these statutes and regulations, "18-to-20-year-olds may not purchase handguns from FFLs." *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives* ("*NRA I*"), 700 F.3d 185, 190 (5th Cir. 2012), *abrogated by Bruen*, 597 U.S. at 19–20. And FFLs effectively *are* the commercial market for handguns—all who "engage in the business of importing, manufacturing, or dealing in firearms" must become FFLs. *See* 18 U.S.C. § 922(a)(1)(A). The Handgun Purchase Ban therefore shuts 18-to-20-year-olds out of the entire commercial market for handguns.

3

Plaintiffs Robert Brown and Benjamin Weekley are law-abiding, adult citizens of the United States who live in West Virginia. They are between the ages of 18 and 21. JA29–30. Brown and Weekley each inquired unsuccessfully about purchasing a handgun from a licensed dealer in the summer of 2022, and both would, if it were not for the Handgun Purchase Ban, purchase handguns and handgun ammunition from a licensed dealer. JA30–31.

Plaintiff West Virginia Citizens Defense League "is a nonpartisan, nonprofit membership organization formed in 2008 with a purpose of preserving, expanding, and perpetuating the right to keep and bear arms in the State of West Virginia." JA30. WVCDL has adult 18-to-20-year-old members who, but for the Handgun Purchase Ban, would purchase handguns and handgun ammunition from licensed dealers. JA30. Both Brown and Weekley are members of WVCDL. JA30.

Plaintiff Brown initiated this action *pro se* on August 30, 2022, seeking relief against the federal agency—the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("BATFE")—and federal officials—the director of the BATFE and the attorney general—responsible for enforcing the Handgun Purchase Ban, as well as the West Virginia Attorney General. JA33. On September 27, 2022, Brown filed, through counsel, the First Amended Complaint (the operative complaint in this case),

which added Weekley, WVCDL, and Second Amendment Foundation[1] as Plaintiffs and dropped the West Virginia Attorney General as a defendant. JA33.

The Government moved to dismiss, and Plaintiffs moved for summary judgment. JA34. The district court denied the Government's motion and granted judgment in Plaintiffs' favor, declaring the Handgun Purchase Ban to be unlawful and enjoining its enforcement. JA67–68. The Government sought a stay pending appeal, which the district court granted. JA71.

## SUMMARY OF ARGUMENT

Under *Bruen*, this Court must review this Second Amendment challenge first by asking whether the plain text of the Amendment covers the conduct prohibited by the Handgun Purchase Ban. If so, then the Ban is presumptively unconstitutional and can only be saved only if the Government demonstrates a tradition of "distinctly similar" historical regulations with roots at the Founding.

The district court's careful analysis followed this framework, and this Court should affirm its decision by following the same method. There can be no doubt that the plain text of the Second Amendment protects the rights of 18-to-20-year-olds to purchase firearms. Although the Amendment explicitly protects "keep[ing]" and "bear[ing]" firearms, it is well established that Constitutional rights extend to cover

---

[1] Second Amendment Foundation's claims were voluntarily dismissed without prejudice and so it is not a party to this appeal. JA30

conduct necessary to their exercise, and here the right to "keep" a firearm necessarily entails the right to acquire one, including through the regulated marketplace. Indeed, the right to keep and bear arms clearly is "infringed" by laws that place obstacles in the way of acquiring those arms in the first place. And Plaintiffs are among "the people" to whom the right applies. The Supreme Court has repeatedly said that this language in the Second Amendment (as well as the First and the Fourth) refers to *all Americans*. Furthermore, *Heller* explained that members of the militia are a subset of the people, and when the Second Amendment was ratified 18-to-20-year-olds universally were understood to be members of the militia. Although early militia statutes did not *confer* a right to keep and bear arms, they demonstrate a background understanding that 18-year-olds were among the people to whom the pre-existing right to keep and bear arms applied.

Turning to history, the Government argues that both Founding-era and later history supports its ability to limit the right of Plaintiffs to buy handguns, but that is false. There is no support for the Handgun Purchase Ban at the Founding, when 18-to-20-year-olds were required to own firearms as part of their militia duties and there were *zero* laws restricting them from using those firearms when not on duty. The Government urges the Court to find support for the Handgun Purchase Ban in the fact that 18-to-20-year-olds were considered "minors" for some purposes at the Founding, or the fact that their parents had, in some cases, significant control over

their lives, but *Bruen* requires that modern restrictions be justified by historical laws that are "relevantly similar" in "how" and "why" they burden the right to bear arms specifically. And none of the Government's Founding-era restrictions burdened that right at all.

In fact, the first laws that could even arguably be considered analogues do not appear until just before the Civil War. These laws are both too little (enacted in only a minority of the states) and too late (enacted between sixty and over one-hundred years after ratification), in the face of the unanimous practice at ratification, to overcome the clear text of the Amendment and that earlier history. The Court need look no further. But even if these later laws are analyzed, once those that were enacted without reference to *any* constitutional provision protecting the right to bear arms and other historical outliers are removed, all are distinguishable as focused exclusively on the practices of minors, who were dependent upon their parents for care and protection. Plaintiffs in this case are legal adults; earlier restrictions on the rights of minors are irrelevant to the Handgun Purchase Ban.

As such, the district court's judgment should be affirmed, as should its award of injunctive relief. As this Court has recognized, an injunction is the appropriate remedy where Plaintiffs' challenge the constitutionality of a congressional enactment. That the district court did not explicitly analyze the injunction factors in its decision is irrelevant since it did analyze those factors in response to the

7

Government's motion for a stay pending appeal and its findings support injunctive relief.

## ARGUMENT

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. The right presumptively "belongs to all Americans," not "an unspecified subset." *Heller*, 554 U.S. at 580, 581, 592. The Amendment enshrines " 'the right of law-abiding, responsible citizens to use arms' for self-defense . . . [and] demands our unqualified deference." *Bruen*, 597 U.S. at 26 (quoting *Heller*, 554 U.S. at 635). For that reason, no important governmental interest can justify legislation that conflicts with the protections of the Second Amendment. Following the Supreme Court's decision in *Bruen*, the following standard governs cases challenging the constitutionality of laws under the Second Amendment:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

*Id.* at 2129–30 (quotation marks omitted). Here, the text of the Amendment encompasses 18-to-20-year-olds' right to acquire handguns and the Government has not demonstrated a historical tradition of firearm regulation at all comparable to the

Handgun Purchase Ban. As a result, the district court was right to grant Plaintiffs'

motion for summary judgment.

I.    **The Second Amendment's Plain Text Covers Plaintiffs' Rights to Purchase Firearms.**

     A. **The Second Amendment Protects the Right to Purchase Firearms.**

The Handgun Purchase Ban prevents Plaintiffs from purchasing handguns and

handgun ammunition from licensed firearms dealers. That is activity covered by the

Second Amendment. The Second Amendment explicitly enshrines a right to "keep"

arms and a right to "bear" them. The Supreme Court has explained that "keep" in

this context means that Americans have a right to "to retain [arms] in one's power or

possession"; *i.e.*, to "have weapons." *Heller*, 554 U.S. at 582 (analyzing Founding

era dictionaries) (cleaned up). As a panel of this Court recently explained, this "is

not complicated. If you do not already own a handgun, then the only way to 'keep'

or 'bear' one is to get one, either through sale, rental, or gift." *Maryland Shall Issue,*

*Inc. v. Moore*, 86 F.4th 1038, 1043 (4th Cir. 2023), *reh'g en banc granted*, 2024 WL

124290 (4th Cir. Jan. 11, 2024). And although the Handgun Purchase Ban does not

prohibit Plaintiffs from receiving a handgun as a gift or from buying one from

someone who is not in the business of selling firearms, it does entirely cut them off

from the regulated commercial market, which is more than enough to implicate the

Second Amendment. The Amendment states that the right "shall not be infringed,"

and anything that hinders the exercise of that right "infringes" it. *Id.* at 1044, n.8; *see also Nunn v. State*, 1 Ga. 243, 251 (1846) ("The right of the whole people . . . to keep and bear *arms* . . . shall not be *infringed*, curtailed, or broken in upon, in the smallest degree[.]" (emphasis in original)); *Heller*, 554 U.S. at 612–13 (citing *Nunn* approvingly). Barring individuals from the commercial market in handguns hinders their ability to keep and bear arms.

Looked at from another angle, constitutional rights are accompanied by "concomitant" protections, *see N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525, 1541 (Alito, J., dissenting), and therefore "protect those closely related acts necessary to their exercise," *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment). And while this Court has granted rehearing in *Maryland Shall Issue*, it is unlikely to disagree with the panel's conclusion that the Second Amendment protects firearm acquisition. As the district court explained, in agreement with many other courts that have reached the same conclusion, "[c]ommon sense tells us that the right to keep and bear arms includes the right to purchase them." JA51; *see also Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("The core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms." (quoting *Ezell v. City of Chi.*, 651 F.3d 684, 704 (7th Cir. 2011)); *Jackson v. City and Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("[T]he right to possess firearms

10

for protection implies a corresponding right to obtain bullets necessary to use them."
(quoting *Ezell*, 651 F.3d at 704)), *abrogated on other grounds by Bruen*, 597 U.S. at
19–20; *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010) (The
conclusion that "there would be no constitutional defect in prohibiting the
commercial sale of firearms . . . would be untenable under *Heller*."), *abrogated on
other grounds by Bruen*, 597 U.S. at 19–20; *Ill. Ass'n of Firearm Retailers v. City of
Chicago*, 961 F. Supp. 2d 928, 930 (N.D. Ill. 2014) ("This right must also include
the right to acquire a firearm."); *Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The
right to keep arms, necessarily involves the right to purchase them."); *see also
Heller*, 554 U.S. at 583 n.7 (2008). A reading of the text to find *possession* protected
but *acquisition* not would eviscerate the Second Amendment and render it a practical
nullity. As the Supreme Court cautioned in *McCulloch v. Maryland*:

> A constitution, to contain an accurate detail of all the subdivisions of
> which its great powers will admit, and of all the means by which they
> may be carried into execution, would partake of the prolixity of a legal
> code, and could scarcely be embraced by the human mind. . . Its nature,
> therefore, requires, that only its great outlines should be marked, its
> important objects designated, and the minor ingredients which compose
> those objects, be deduced from the nature of the objects themselves.

17 U.S. 316, 407 (1819). With that in mind, an Amendment protecting the right to
keep arms free from any infringement must be understood to protect the right to
purchase firearms.

The Government disputes this point, arguing that Plaintiffs could go to "other sources" to acquire firearms and claiming that the Handgun Purchase Ban is merely one of the "laws imposing conditions and qualifications on the commercial sale of arms" on which the Supreme Court in *Heller* said it was not "cast[ing] doubt." Br. for Appellants, Doc. 19, at 9–10 (Jan. 22, 2024) ("Gov't Br.") (second and third quotes from *Heller*, 554 U.S. at 626–27 & n.26). As to the first point, this is an argument about the degree of burden that the Handgun Purchase Ban imposes, but the plain text of the Second Amendment is implicated whenever the right to keep and bear arms is *infringed*, *i.e.*, when the right is "*hinder*[*ed*]." SAMUEL JOHNSON, 1 DICTIONARY OF THE ENGLISH LANGUAGE 1101 (4th ed. 1773) (emphasis added); NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828); *see also Maryland Shall Issue*, 86 F.4th at 1044. Indeed, *Bruen* itself did not concern a total ban but rather a licensing regime that restricted public carry to those with atypical self-defense needs. And *Heller* concerned a ban on handguns, not all firearms. *Heller* and *Bruen* therefore refute the Government's implicit suggestion that this Court should excuse laws that implicate the Second Amendment based on how severely the Government (or the Court) perceives them to burden the right.

The question, at this point, is whether the text of the Second Amendment is implicated at all, and the answer must be yes. It would clearly *implicate* the First Amendment, for instance, to pass a law that burdens a small minority religious

12

practice even as it leaves other avenues for religious observance open, *see, e.g., Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993), just as it *implicates* the Fourth Amendment for a police officer to conduct a "carefully limited search of the outer clothing . . . in an attempt to discover weapons," *Terry v. Ohio*, 392 U.S. 1, 30 (1968). Whether this infringement upon the right described in the Second Amendment's text is a justifiable one is an issue for the historical analysis mandated by *Bruen*.

Furthermore, the Handgun Purchase Ban does more than close off *one* way for Plaintiffs to acquire handguns. It closes off *the most important* way to do so:

> [O]ther options are not always readily available to many individuals. Not all young adults have friends or family members who are able or willing to gift them a gun. And secondary markets are not always available to everyone or easy to navigate safely. On the other hand, licensed dealers come with assurances of quality, safety, legality, and more.

*Hirschfeld v. BATFE*, 5 F.4th 407, 417 (4th Cir. 2021), *vacated as moot* 14 F.4th 322 (4th Cir. 2021).[2] It is hard to even imagine the Government arguing that a law

---

[2] The Government argues that the district court should not have relied upon *Hirschfeld* because it was vacated as moot after the panel opinion issued and "before further review was possible." Gov't Br. 23. Be that as it may, *Hirschfeld* remains persuasive for its thorough discussion of the very same question the Court faces again here, and the district court was far from alone in finding it useful. JA67 n.10 ("Again, although *Hirschfeld* itself was vacated, the historical analysis and summary detailed in that opinion remains accurate."); *see also, e.g., Lara v. Comm'r Pa. State Police*, 91 F.4th 122, 132 & n.12 (3d Cir. 2024) (calling *Hirschfeld*'s analysis "instructive"); *Worth v. Harrington*, 666 F. Supp. 3d. 902, 911, 914–16, 923 (D. Minn. 2023) (repeatedly relying on *Hirschfeld*).

13

barring individuals from purchasing books from those in the business of selling books does not even *implicate* the First Amendment rights of book buyers, yet that would be the First Amendment equivalent of what the Government is arguing here. By precluding individuals from the principal way by which they can acquire a firearm and thereby exercise their Second Amendment right to keep and bear arms, the Handgun Purchase Ban regulates conduct falling within the plain text of the Second Amendment.

As to the Government's second point, the Handgun Purchase Ban is not simply a "condition[ or] qualification[] on the commercial sale of arms." *Heller*, 554 U.S. at 627. That language is best read as referring to "a hoop someone must jump through to *sell* a gun, such as obtaining a license, establishing a lawful premise, or maintaining transfer records," not a "total ban on *buying* a gun from a licensed dealer that has met the required conditions and qualifications to sell arms." *Hirschfeld*, 5 F.4th at 416. The Fifth Circuit similarly remarked that "[i]t is not clear that the Court had an age qualification in mind when it penned that sentence." *NRA I*, 700 F.3d at 206; *see also United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010), *abrogated by Bruen* (reasoning that it would be "untenable under *Heller*" if there "would be no constitutional defect in prohibiting the commercial sale of firearms"). A law that indirectly bars law-abiding citizens from acquiring handguns from dealers

operates not simply as a "condition" on selling handguns but as a ban on acquiring them. *Id.*

### B. The Second Amendment Applies to 18-to-20-Year-Olds.

The district court held that " 'ordinary, law-abiding, adult citizens' between the ages of 18-to-20-years, are 'part of the people whom the Second Amendment protects.' " JA54 (quoting *Bruen*, 597 U.S. at 8). It was correct to do so and indeed, the Government does not seriously dispute the point.

Two key elements of the Amendment's text, as conclusively interpreted by the Supreme Court, remove any doubt that 18-to-20-year-olds have full Second Amendment rights.

*First*, the Amendment refers to a right of "the people" to keep and bear arms without mentioning age. The " 'normal and ordinary' meaning" of "the people" includes *all* the people. *Bruen*, 597 U.S. at 19. In other words, the American "people" simply are the persons who make up our Nation. *See* JOHNSON, DICTIONARY OF THE ENGLISH LANGUAGE at 1503 (defining "people" as "A nation; those who compose a community."); WEBSTER, AMERICAN DICTIONARY (defining "people" as "The body of persons who compose a … nation."). Thus, as the Supreme Court held in *Heller*, "the Second Amendment right is exercised individually and belongs to *all* Americans." 554 U.S. at 581 (emphasis added); *Nunn*, 1 Ga. at 250 ("The right of the whole people, old and young, men, women[,] and boys, and not militia only, to

keep and bear *arms* of every description, and not *such* merely as are used by the *militia*, shall not be *infringed*, curtailed, or broken in upon, in the smallest degree.") (emphasis in original). Quoting *Heller*, *Bruen* reiterated that "the Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." 597 U.S. at 70. The exceptions are shown by history; they are not a matter of plain text.

Furthermore, construction of the Constitution requires reading individual amendments and clauses "in the context of the Constitution as a whole." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 325–26 (2015). In context, the Constitution elsewhere explicitly considers and prescribes limits based on age. *See, e.g.*, U.S. CONST. art. I, § 2, cl. 2 (must be 25 years old to serve in the House of Representatives). "In other words, the Founders considered age and knew how to set age requirements but placed no such restrictions on rights, including those protected by the Second Amendment." *Hirschfeld*, 5 F.4th at 421. And in the two other provisions in the Bill of Rights that explicitly describe a right of "the people" generally—the First and the Fourth Amendments—the rights extend to 18-year-olds and in fact extend to *the whole people*, even those under 18. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969) ("Students . . . are 'persons' under our Constitution [who] are possessed of fundamental rights which the State must respect"); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943); *New*

*Jersey v. T.L.O.*, 469 U.S. 325, 334 (1985) ("Equally indisputable is the proposition that the Fourteenth Amendment protects the [incorporated Fourth Amendment] rights of students against [unreasonable searches and seizures] by public school officials."); *see also Hirschfeld*, 5 F.4th at 421. It would make no sense to interpret "the people" in the Second Amendment to have a different meaning than it does in the First and Fourth Amendments, particularly when it "seems to have been a term of art employed in select parts of the Constitution." *Heller*, 554 U.S. at 580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). And "[w]hen the term *the people* is made use of . . . in all the enumerations and guaranties of rights [in the Constitution] the whole people are intended." THOMAS M. COOLEY, THE GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA 267–68 (1880); *accord Heller*, 554 U.S. at 580–81. Even where "the people" does not appear, *every other constitutional right* applies *at least* to those 18 and older. *Hirschfeld*, 5 F.4th at 422–23 (noting that the right to jury trial, voting, marriage, and sex apply at least to those 18 years old).

The Government takes issue with the district court's reference to the First and Fourth Amendment's similar language because "history shows that the Second, First, and Fourth Amendments do not share the same scope." Gov't Br. 21. But at this stage in the analysis, the *history* of the Amendment is not implicated beyond determining what the "bare text" means. *Bruen*, 597 U.S. at 44, n.11. And while it

17

is true that history ultimately may demonstrate a difference in how the Government constitutionally may regulate the people under the First, Second, and Fourth Amendments, any such differences are not discernable from the plain text.

*Second*, the Amendment includes a "prefatory clause" which begins: "[a] well regulated Militia, being necessary to the security of a free State . . . ." As *Heller* explained, this clause "announces the purpose for which the right was codified: to prevent elimination of the militia." 554 U.S. at 595, 599. As such, although the right is not limited to those who were in the militia or eligible for militia service at the Founding (it is unquestionably broader and includes, for example, women), "[l]ogic demands that there be a link between the stated purpose and the command," *id.* at 577, meaning that if an individual would have been a member of the "militia," *at least* he must be part of "the people" protected by the Amendment. Indeed, *Heller* explained that "the 'militia' in colonial America consisted of a *subset* of 'the people.'" 554 U.S. at 580 (emphasis added). And if "the militia" was a subset of "the people," it necessarily follows that all members of the organized militia also were members of "the people."

When the Second Amendment was ratified, the "militia" was understood to refer to "all able-bodied men," *id.* at 596, including in the unanimous judgment of the federal government and every state in the union, all male citizens of at least 18 years of age, *Jones v. Bonta*, 34 F.4th 704, 718–19 & App'x 2 (9th Cir. 2022)

(collecting post-ratification state militia laws), *vacated on reh'g and remanded in light of Bruen*, 47 F.4th 1124 (Mem.). This is apparent from Congress's initial exercise of its power to "provide for organizing, arming, and disciplining, the militia." U.S. CONST. art. I, § 8, cl. 16. The Militia Act of 1792, subd. ch. 33 § 1, 1 Stat. 271, passed by the Second Congress just months after the Second Amendment was ratified, "commanded that every able-bodied male citizen between the ages of 18 and 45 be enrolled in the militia and equip himself with appropriate weaponry." *Jones*, 34 F.4th at 718–19 (quoting *Perpich v. Dep't of Def.*, 496 U.S. 334, 341 (1990) (alterations omitted)). As a contemporaneous act of Congress, the Militia Act provides extraordinarily powerful evidence that individuals by 18 were understood to be part of the militia and therefore among the people protected by the Second Amendment.

> [M]any of the members of the Second Congress were also members of the First, which had drafted the Bill of Rights. But more importantly, they were conversant with the common understanding of both the First Congress and the ratifying state legislatures as to what was meant by 'Militia' in the Second Amendment.

*Parker v. Dist. of Columbia*, 478 F.3d 370, 387 (D.C. Cir. 2007), *aff'd by Heller*, 554 U.S. 570; *see also Eldred v. Ashcroft*, 537 U.S. 186, 213 (2003) ("[T]his Court has repeatedly laid down the principle that a contemporaneous legislative exposition of the Constitution when the founders of our Government and framers of our Constitution were actively participating in public affairs, acquiesced in for a long

term of years, fixes the construction to be given the Constitution's provisions." (cleaned up)).

The legislative history of the Militia Act lends further support. In 1790, Secretary of War Henry Knox submitted a militia plan to Congress providing that "all men of the legal military age should be armed," and that "[t]he period of life in which military service shall be required of the citizens of the United States [was] to commence at eighteen." 2 ANNALS OF CONGRESS 2145–46 (Joseph Gales ed., 1834). Representative Jackson explained "that from eighteen to twenty-one was found to be *the best* age to make soldiers of." *Id.* at 1860 (emphasis added).

Eighteen is also the age that George Washington recommended for beginning militia enrollment. In an enclosure to a 1783 letter to Alexander Hamilton, General Washington—who as President in 1792 signed the Militia Act into law—wrote that "the Citizens of America . . . from 18 to 50 Years of Age should be borne on the Militia Rolls" and "so far accustomed to the use of [Arms] that the Total strength of the Country might be called forth at Short Notice on any very interesting Emergency." *Sentiments on a Peace Establishment* (May 2, 1783), *reprinted in* 26 THE WRITINGS OF GEORGE WASHINGTON 389 (John C. Fitzpatrick, ed. 1938).

Shortly after the federal age for militia participation was set at 18, every state set the age at 18 as well. *Jones*, 34 F.4th at 719 & App'x 2. The Government attempts to dispute this point, suggesting that the age for militia service at the Founding was

20

changeable, and that "Founding Era legislatures retained discretion to exclude 18-to-20-year-olds." Gov't Br. at 18. For example, the Government emphasizes that in colonial Pennsylvania, Benjamin Franklin drafted and succeeded in passing a law that required enrollment of men over 21 in the militia. *See* Gov't Br. at 19. But that law had been repealed by the enactment of the Second Amendment, as from 1777 onward Pennsylvania required enrollment at 18. *See Hirschfeld*, 5 F.4th at 433 & nn. 41–42. And even 18-year-olds *could* enroll in the colonial Pennsylvania militia, and they were heavily incentivized to do so. At this time Pennsylvania levied a tax on " 'every male white person … between the ages of sixteen and fifty years' who had not joined the militia." David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U. L.J. 495, 561 (2019) (quoting 8 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682–1801 201 (1898)). In any event, a law only requiring 21-year-olds to enroll does not demonstrate that 18-year-olds were not understood to be part of the militia. "Although the militia consists of all able-bodied men," laws *organizing* that body may address only "a subset of them." *Heller*, 554 U.S. at 596.

Plaintiffs are unaware of even a single state that exempted 18-to-20-year-olds from militia service at the time the Second Amendment was ratified. Indeed, a comprehensive survey of over 250 separate state and colonial provisions enacted from the seventeenth through the end of the eighteenth century found that the

minimum "age for militia duty" was never higher than 18 "except for one 19-year period in Virginia [between 1738 and 1757]." Kopel & Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U. L.J. at 533.

The Government objects that "authorization to carry a firearm while serving in the militia . . . does not determine the scope of the right to bear arms outside that context." Gov't Br. 20. To be clear, Plaintiffs do not contend that these militia laws somehow *extended* Second Amendment rights to 18-year-olds. Indeed, *Heller* made clear that the Second Amendment enshrines "an individual right unconnected with militia service." 554 U.S. at 582. Instead, the point is that "the well-regulated Militia" referred to in the Amendment's prefatory clause, which the Constitution understood to be an entity "already in existence" made up of "all able-bodied men," is the "pool" from which

> Congress has plenary power to organize the units that will make up an effective fighting force. That is what Congress did in the first Militia Act, which specified that each and every free able-bodied white male citizen . . . who is or shall be of the age of eighteen years . . . shall severally and respectively be enrolled in the militia.

*Id.* at 596 (quoting Act of May 8, 1792) (quotation marks omitted). Given that "the federally organized militia may consist of a subset of" the "militia" referenced in the Second Amendment, but nevertheless *must* draw from that larger body, the unanimous inclusion of 18-to-20-years-old in organized militias at or shortly after the ratification of the Second Amendment establishes that they *must* have been

22

within the militia referenced by the Second Amendment. *Id.* And since *Heller* teaches that "the 'militia' in colonial America consisted of a subset of 'the people,' " *id.* at 580, it follows that "those required to serve in the militia and bring arms would most assuredly have been among 'the people' who possessed the right." *Hirschfeld*, 5 F.4th 407, 429–30. As a result, "any argument that 18-to-20-year-olds were not considered, at the time of the founding, to have full rights regarding firearms" is "inconceivable." *Nat'l Rifle Ass'n, Inc. v. BATFE*, 714 F.3d 334, 342 (5th Cir. 2013) (Jones, J., dissental) ("*NRA II*").

## II.    The Handgun Purchase Ban Cannot Be Justified By Reference to Any Historical Firearms Regulations.

The text of the Second Amendment covers purchasing handguns and applies to Plaintiffs, so the Handgun Purchase Ban is unconstitutional under *Bruen* unless the Government can "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 597 U.S. at 24. The Supreme Court was clear: the burden is on the Government to *prove* that the Handgun Purchase Ban is constitutional, and the only acceptable standard against which to judge its constitutionality is the history of firearm regulation in this country. *Id.*; *see also id.* at 26 ("The Second Amendment . . . 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense. It is this balance—struck by the traditions of the American people—that demands our unqualified deference." (quoting *Heller*, 554 U.S. at 635)).

When applying this test, the Supreme Court has provided significant guidance to this Court. For instance, it has cautioned that historical regulations cannot justify a modern law unless they are "relevantly similar," meaning that the historical regulations imposed "a comparable burden on the right of armed self-defense" that was "comparably justified." *Bruen*, 597 U.S. at 29. In cases where, as here, the "problem" sought to be addressed (the availability of firearms to 18-to-20-year-olds like Plaintiffs) "has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 26. And when analyzing historical analogues, the greatest attention must be placed on the practices of the founding generation because, "when it comes to interpreting the Constitution, not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.' " *Id.* at 34 (quoting *Heller*, 554 U.S. at 634–35 (emphasis in *Bruen*); *see Lara*, 91 F.4th at 134 ("[T]o maintain consistency in our interpretation of constitutional provisions, we hold that the Second Amendment should be understood according to its public meaning in 1791."); Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, Not 1868*, HARV. J. L. & PUB. POL'Y PER CURIAM, (Fall 2022), *available at* https://bit.ly/3uGTcQg.

Two principles require 1791 to be the focus of this Court's analysis. First, with respect to the federal government, the Supreme Court has *always* treated 1791as the key date for determining the meaning of the Bill of Rights. *Bruen*, 597 U.S. at 36–37; *see also Crawford v. Washington*, 541 U.S. 36, 42–50 (2004); *Virginia v. Moore*, 553 U.S. 164, 168–69 (2008); *Nev. Comm'n on Gaming Ethics v. Carrigan*, 564 U.S. 117, 122–25 (2011). Second, the Supreme Court has made clear that the Bill of Rights, including the Second Amendment, means the same thing applied against the federal government directly as it does when applied against the states. *McDonald v. City of Chicago*, 561 U.S. 742, 765–66 (2010) (collecting cases). Putting these two principles together, binding Supreme Court precedent mandates treating 1791 as the key date for determining the meaning of the Bill of Rights, and even if *Bruen* cast doubt on this practice (it did not, it also treated evidence from the Founding as generally dispositive of the scope of the right, *see id.* at 2136–37), this Court would remain bound to follow these decisions until the Supreme Court clearly overruled them, *see Agostini v. Felton*, 521 U.S. 203, 237 (1997); *see also Bruen*, 597 U.S. at 34–36 (Barrett, J., concurring).

More than that, applying the 1791 meaning is logical too. It does not matter that the Second Amendment only became applicable to the States through the Fourteenth Amendment—the *Second Amendment* became applicable then, not whatever interpretation of the Second Amendment reigned in 1868. Hawaii did not

become a state until 1959. It would be untenable to suggest that Hawaii must adhere

to the understanding of the right to keep and bear arms that reigned during President

Eisenhower's second term in office.

### A. The Unanimous Practice of the Founding Era Was to Permit 18-to-20-Year-Olds to Exercise Their Second Amendment Rights on Equal Footing with Older Americans.

1. The evidence at this most important period of history is dispositive. The

Government broadly states that "Founding Era evidence reflects that the ratifiers did

not view the Second Amendment as stripping legislatures of authority to prohibit the

commercial sale of handguns to 18-to-20-year-olds." Gov't Br. 9. There is, in fact,

*zero* evidence to back up that claim. Well before the Founding era, the tradition of

18-to-20-year-olds "keeping and bearing arms [was] deep-rooted in English law and

custom" and "was brought across the Atlantic by the American colonists." *Jones*, 34

F.4th at 717. As discussed above, in the period immediately following ratification

"every state's militia law *obliged*" 18-to-20-year-olds "to acquire and possess

firearms." 34 F.4th at 719 (emphasis added); *see also United States v. Miller*, 307

U.S. 174, 179 (1939) ("[W]hen called for service these men were expected to appear

bearing arms supplied by themselves."). As already surveyed, "[a]t the time of the

Second Amendment's passage, or shortly thereafter, the minimum age for militia

service in *every state* became eighteen." *NRA II*, 714 F.3d at 340 (Jones, J., dissental)

(emphasis added).

26

In addition to the "founding-era evidence of militia membership [which] undermines [the district court's] interpretation" of the Amendment, 18-to-20-year-olds were expected to bear arms as part of the *posse comitatus*, which "allowed sheriffs and others to compel citizens to serve in the name of the state to execute arrests, level public nuisances, and keep the peace, upon pain of fine and imprisonment." *Jones*, 34 F.4th at 718, 722 (cleaned up). Similarly, at common law by age 18 all able-bodied men "were obliged to join in the 'hue and cry' (*hutesium et clamor*) to pursue fleeing criminals." Kopel & Greenlee, *Second Amendment Rights*, *supra* at 534. So, 18-to-20-year-olds at the founding had firearms, were expected to use them in the same circumstances as other law-abiding citizens, and *no state* set any restrictions on their ability to lawfully use them outside of these special capacities. After exhaustively surveying historical gun regulations related to firearm purchasing by 18-to-20-year-olds, this Court in *Hirschfeld* concluded that it was not until 1856 that *any* state restricted the ability of 18-to-20-year-olds to "possess or purchase weapons." 5 F.4th at 437.

2. The Government's argument to the contrary is founded on weak evidence. Indeed, the Government relies overwhelmingly on the fact that "[t]he age of majority at common law was 21" and therefore that, at the Founding, 18-to-20-year-olds were minors. Gov't Br. at 11. But the common law age of majority cannot bear the weight the Government places on it, for several reasons.

27

*First*, the age of majority did not have talismanic significance. As even the Government acknowledges, at the Founding "legislatures established age qualifications for a range of activities, from getting married, to becoming a naturalized citizen, to forming enforceable contracts." *Id*. at 10 (citations omitted); *see also id.* at 11 (listing other activities). For example, by the age of 12 individuals could consent to marriage, by 14 they could select a guardian should they be left without one, and by the age of 17 they could devise a will and serve as the executor of an estate. 1 BLACKSTONE COMMENTARIES *463–64; *see also Hirschfeld*, 5 F.4th at 435.

*Second*, the age of majority did not have *any* significance for firearm rights. Rather, as we have explained, at the Founding it was universally acknowledged that by the age of 18 individuals were members of the militia and therefore capable of (and entrusted with) bearing arms. And there were *zero* laws restricting 18-to-20-year-olds' ability to acquire or use their privately-owned arms on account of their age. Indeed, just a few years before the ratification of the Second Amendment, in the winter of 1787–88, future president Andrew Jackson, at the time a 20-year-old attorney preparing to move to (what would become) Tennessee, purchased for himself "a rifle and a good pair of pistols" to arm himself for his journey. HENDRIK BOORAEM, YOUNG HICKORY: THE MAKING OF ANDREW JACKSON 195, 199 (2001),

https://bit.ly/48uq2l3. It is evident that no ban on the acquisition of firearms existed for people in this age group just because they were "minors."

*Third*, even if minority status did have talismanic significance for Second Amendment rights (and it did not), that would not help the Government because Plaintiffs *are not minors*. The *Bruen* analysis requires courts to evaluate Founding-era traditions of firearm regulation to determine the principles that limit the scope of the Second Amendment, but then those principles must be applied to today's circumstances. This can be seen in the related context of which *arms* can be regulated consistent with the Second Amendment. *Heller* identified one Founding-era tradition of regulation that could support restrictions on particular types of arms: "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" 554 U.S. at 627. But as *Bruen* makes clear, having identified this principle, it must be evaluated against today's circumstances. "Thus, even if [certain] colonial laws prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today." 597 U.S. at 47. Similarly, even if 18-to-20-year-olds were limited in their Second Amendment rights at the Founding because of their minority status, that would provide no justification for restriction the Second Amendment rights of 18-to-20-year-old *adults* today. Indeed, doing so would be particularly perverse, as 18-to-20-year-olds

29

would then be both deprived of the right to have *someone else* legally obligated for their care and protection (on account of being above the age of majority) while also being deprived of their right to protect *themselves* (by virtue of, in the Government's view, lacking Second Amendment rights).

*Fourth*, even we were wrong about all of this, it *still* would not support the Government's position. That is because the Supreme Court, in the First Amendment context, has expressly *rejected* the notion that the Government can leverage the historic right of parents to control their minor children to support laws that bypass parents and restrict the rights of children directly. *See Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 564 U.S. 786, 795 n.3 (2011). Rather, the historic rights of parents *at most* support the Government giving effect to the expressed wishes of a parent—for example, "to require . . . that the promoters of a rock concert exclude those minors whose parents have advised the promoters that their children are forbidden to attend." *Id*. They do not support restrictions that require *affirmative consent* from parents before children can access a product or service connected with the exercise of a fundamental right. And, of course, the rights of parents have no bearing at all in situations dealing with the rights of legal adults.

3. The smattering of additional Founding-era evidence cited by the Government fares no better. For example, the Government quotes John Adams and Gouverneur Morris as reflective of the Founders' "view that reason and judgment

30

are not fully developed before age 21." Gov't Br. at 12. But these statements addressed why individuals under 21 should not have the right *to vote*. And 18-to-20-year-olds were not permitted to vote at the Founding, so these statements were backed up by actual legal restrictions. But such restrictions have no bearing on laws restricting firearm rights. There is no indication that the ratifiers of the Second Amendment saw any connection at all between the right to vote and the right to keep and bear arms and *Heller* forecloses linking the two. Voting is a "civic right" or "a right that was exercised for the benefit of the community … rather than for the benefit of the individual." *Kanter v. Barr*, 919 F.3d 437, 462–63 (7th Cir. 2019) (Barret, J., dissenting). "*Heller*, however, expressly rejects the argument that the Second Amendment protects a purely civic right. It squarely holds that 'the Second Amendment confer[s] an *individual right* to keep and bear arms,' and it emphasizes that the Second Amendment is rooted in the individual's right to defend himself." *Id.* at 463 (quoting *Heller*, 554 U.S. at 595) (citations omitted).

In any event, any statements from the founders about the immaturity of 18-to-20-year-olds should be read to support Plaintiffs, because they would show that the Founding generation was fully aware of potential maturity issues of people in this age group and yet did *nothing* to restrict their access to firearms but instead *mandated* it. *See Bruen*, 597 U.S. at 26–27; *NRA II*, 714 F.3d at 342.

Nor does it matter that "infants" were exempted from serving as peace officers. *See* Gov't Br. 12–13. The Government's support for that claim comes from a justice of the peace manual, which likewise decreed that "clergymen, attorneys . . . lawyers, . . . old and sick persons," were exempt from service as constables. JOHN FAUCHEREAUD GRIMKE, THE SOUTH CAROLINA JUSTICE OF THE PEACE 117 (1788). Plainly, the duty to serve as a constable was more limited than the right to bear arms.

### B. Reconstruction Era History Confirms That 18-to-20-Year-Olds Have Full Firearm Rights.

In view of the unanimous practice of the Founding era of treating 18-to-20-year-olds as having full Second Amendment rights, this Court need look no further. *See Lara*, 91 F.4th at 134 & n.15 ("We thus set aside the Commissioner's catalogue of statutes from the mid-to-late nineteenth century, as each was enacted at least 50 years after the ratification of the Second Amendment."). The district court found it dispositive that the Government "failed to offer evidence of a similar regulation between [the period before or at the Founding] and 1791 or in a relevant timeframe thereafter." JA66. It was right to do so. "*Heller*'s interest in mid- to late-19th century commentary was secondary. . . . In other words, [*Heller*'s] 19th-century evidence was 'treated as mere confirmation of what the Court thought had already been established,' " by earlier sources of information about the right. *Bruen*, 597 U.S. at 36–37 (quoting *Gamble v. United States*, 139 S. Ct. 1960, 1975–76 (2019)).

Even if the Government's late-in-time evidence is considered, it does not favor a different result. The Government wrongly claims that "[w]ithin a lifetime of the founding, state legislatures enacted laws that parallel the restrictions here," Gov't Br. 12, and that "nineteenth century evidence demonstrates that at least 20 jurisdictions enacted laws that parallel the federal restrictions," *id.* at 9. But as this court acknowledged in *Hirschfeld*, the first laws that are even arguably similar to the Handgun Purchase Ban were not adopted until 1856. 5 F.4th at 437. That is not "within a lifetime of the founding." By 1826, Jefferson and Adams had passed away, and with the death of James Madison in 1836, the Founding generation had been two decades off the scene by the time the Government's first proffered analogues were enacted. And in addition to being too late, the Government's catalog of laws is too little. The Government has identified laws in seventeen states that restricted the ability of 18-to-20-year-old minors to acquire firearms between 1856 and 1900. (The Government only gets to twenty by citing two laws from non-state jurisdictions— the District of Columbia and the Territory of Wyoming, 27 Stat. 116–17 (1892); 1890 Wyo. Sess. Laws 1253—and a Nevada law restricting concealed (but not open) carry.) This purported tradition is thus far from a majority one, as by 1900 there were 45 states in the union, and it is much less widespread than the laws of 30-plus states the Supreme Court has rejected as not establishing a valid tradition for regulation in

33

the First Amendment context. *See Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2258–59 (2020).

There are other reasons to reject a rule based on the Government's analogues. Just three of them predate the adoption of the Fourteenth Amendment, which is the latest possible date at which the meaning of Second Amendment rights would be set. *See* 1856 Ala. Acts. 17; 1856 Tenn. Pub. Acts 92; Edward Bullock & William Johnson*, The General Statutes of the Commonwealth of Kentucky* 359, § 1 (1873) (reporting an 1859 enactment). And all of those laws were from slave states. As the *Hirschfeld* panel remarked when discussing the Alabama and Tennessee laws, "[i]t would . . . be strange to rely on two southern laws restricting gun rights that were enacted before the Civil War given Congress's grave concerns about southern states disarming freed Blacks during this period." *Hirschfeld*, 5 F.4th at 440; *see also McDonald*, 561 U.S. at 770–78; *Jones*, 34 F.4th at 722 (noting the "deeply offensive nature of many of" "the Reconstruction-era laws" restricting the Second Amendment rights of 18-to-20-year-olds).

The other, even later laws, should similarly not be seen to support the Handgun Purchase Ban. One law cited by the Government did not prevent purchase of handguns at all, it merely forbade them to be carried concealed, so it did not burden the exercise of the right to the same degree as the Handgun Purchase Ban. 1885 Nev. Stat. 51. One law comes from Kansas, 1883 Kan. Sess. Laws 159, which

34

was singled out by *Bruen* as an example of a state that, around this time, "operated under a fundamental misunderstanding of the right to bear arms, as expressed in *Heller*," 597 U.S. at 68. *Bruen* was also dismissive of overly restrictive firearm laws in the Western Territories, which "were rarely subject to judicial scrutiny" and deserving of "little weight," *id.* at 68–69. The Government's Wyoming law qualifies. 1890 Wyo. Sess. Laws 1253. Several other laws come from states with no Second Amendment analogue and so were passed by legislatures that did not consider themselves bound to respect a right to bear arms of their citizens. *See* Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 TEX. REV. OF L. AND POLITICS 191, 193–204 (2006); 16 Del. Laws 716 (1881); 1881 Ill. Laws 73; 1884 Iowa Acts 86; 1882 Md. Laws 656; 1890 La. Acts 39; 1882 W. Va. Acts 421–22; 1883 Wis. Sess. Laws 290. And two local restrictions from Chicago, Proceedings of the Common Council of the City of Chicago for the Municipal Year 1872–3, at 113–14 (1874), and Lincoln, Nebraska, 1895 Neb. Laws 237–38, *Laws of Nebraska Relating to the City of Lincoln*, Art. XXVI, §§ 2, 5, should be disregarded both because they were "irrelevant" to most of the country, *Bruen*, 597 U.S. at 66–67, and because, by virtue of being purely local, were lesser burdens on the rights of 18-to-20-year-olds (who could leave town) than the nationwide Handgun Purchase Ban.

Furthermore, as explained above, the Government has cited the laws of seventeen states restricting access to firearms. Fourteen of those seventeen

(including all seven not already distinguished in the prior paragraph) are targeted not at any particular age but rather at minority *status*. *See* 1856 Ala. Acts 17; 16 Del. Laws 716 (1881); 1876 Ga. Laws 112; 1881 Ill. Laws 73; 1883 Kan. Sess. Laws 159; Bullock & Johnson, *General Statutes* 359 (Kentucky) 1884 Iowa Act 86; 1878 Miss. Laws 175–76; Mo. Rev. Stat. § 1274 (1879); 1893 N.C. Sess. Laws 468–69; 1890 Okla. Laws 495; 1856 Tenn. Acts 92; 1897 Tex. Gen. Laws 221–22; 1883 Wis. Sess. Laws 290. As already explained, *Bruen* requires asking *both* "how and why" past laws infringed on the Second Amendment right, and historical laws can only serve as useful analogues if their modern comparator is "comparably justified." *Bruen*, 597 U.S. at 29. That test is not met here for the simple reason that these statutes are explicitly predicated on a status (legal minority) that does not apply to 18-to-20-year-olds today. To the extent these laws restricting the rights of minors applied to 18-to-20-year-olds, they did so because 18-to-20-year-olds were minors under the legal protection of their parents or guardians. *See, e.g.*, 1 BLACKSTONE COMMENTARIES *441. Indeed, seemingly unaware that Plaintiffs today are not minors and that it dooms its case, the Government asserts repeatedly that these "historical laws were enacted to prevent crime by minors." Gov't Br. 16 (citation omitted). But the same cannot possibly be said of the Handgun Purchase Ban's application to Plaintiffs, who are not minors but legal adults. And we are not aware of any law from any potentially relevant time frame that singled out the firearm

rights of legal *adults* for special restrictions based on their being younger than other legal adults. *See, e.g.*, JOHN BOUVIER, 1 INSTITUTES OF AMERICAN LAW 148 (1851) (explaining that upon reaching the age of majority, "every man is in the full enjoyment of his civil and political rights").

The incongruity of relying on these laws to support the Handgun Purchase Ban is brought into even sharper focus by the fact that in at least five of the states with laws restricting the ability of minors to acquire firearms, the age of majority for women was 18. *See NRA II*, 714 F.3d at 344 (Jones, J., dissental); *Nat'l Rifle Ass'n, Inc. v. Bondi*, 614 F.4th 1317, 1333 (11th Cir. 2023), *reh'g en banc granted, vacated by* 72 F.4th 1346 (Mem.). This means that the laws in these states, which were predicated on minority status, would not have restricted 18-to-20-year-old women, and it highlights that the laws were based on minority status, not age.

The Government claims that these laws were popular, citing newspaper editorials from the period. Gov't Br. at 15. But the popularity of a given measure among newspaper editors or even ordinary Americans—to the extent such a thing can be accurately gauged at remote points in our history from published editorials— is simply irrelevant. Neither *Bruen* nor *Heller* considered the popularity of historical restrictions in their very detailed analyses of history.

The Government claims these laws were vetted and found Constitutional, citing *State v. Callicutt*, 69 Tenn. 714, 716–17 (1878) and a popular treatise, THOMAS

M. COOLEY, TREATISE ON CONSTITUTIONAL LIMITATIONS 740 n.4 (5th ed. 1883). *See* Gov't Br. 15–16. *Callicutt* does not help the Government. In that decision, the Tennessee Supreme Court upheld a conviction for selling pistols to minors. To the extent *Callicutt* passed upon the constitutionality of the law at issue, it only "addressed concealed carry of dangerous weapons, not the right to keep and bear arms more generally." *Jones*, 34 F.4th at 720. The only legal reasoning in *Callicutt* on the scope of the right to bear arms is a pair of citations to *Aymette v. State*, 21 Tenn. 154 (1840) and *Page v. State*, 50 Tenn. 198 (1871). *Heller* singled out *Aymette* as demonstrating an "odd reading of the right" that simultaneously permitted citizens "to carry arms openly, unconnected with any service in a formal militia, but . . . use them only for the military purpose of banding together to oppose tyranny." 554 U.S. at 613. This interpretation was "not the one [the Court] adopt[ed]" in *Heller*. *Id.* *Page* asserted that the legislature could restrict carrying a revolver because it was not "an arm for war purposes." 50 Tenn. At 198. Again, *Heller* made clear that the Amendment is not limited to protecting arms for war purposes but "extends, prima facie, to all instruments that constitute bearable arms." 554 U.S. at 582. *Callicutt* is not good law and has nothing informative to say about the appropriate scope of the Second Amendment right.

As for Cooley's treatise, which stated in a footnote that "the State may prohibit the sale of arms to minors," Gov't Br. 15, Cooley elsewhere was clear that it the

Second Amendment applied to "the whole people," Cooley, *supra* GENERAL PRINCIPLES, at 268, and Cooley was not here endorsing the view that bans on sales to minors were constitutional (and again, Plaintiffs are not minors). The sentence appeared in the section of his treatise regarding the police power and Cooley was merely "identifying . . . a case related to his discussion, which is how he utilized footnotes to cite thousands of cases throughout [his] treatise." Kopel & Greenlee, *History and Tradition in Modern Circuit Cases on the Second Amendment Rights of Young People*, 43 S. ILL. LAW J. 119, 143 (2018). What is more, Cooley's only authority for the statement in the footnote was *Callicutt*, so the Government's two sources here are really just one.

Finally, the Government claims support from the fact that "in modern times, 'all fifty States (and the District of Columbia) have imposed minimum-age qualifications on the use or purchase of particular firearms.' " Gov't Br. 16 (quoting *NRA I*, 700 F.3d at 190 n.4). But no one is arguing that there cannot be *any* minimum age requirements with respect to firearms—that would be absurd. Rather, the minimum age requirement for handgun purchasing *cannot be 21*. And aside from the federal Handgun Purchase Ban, most states recognize 18-year-olds as having full rights regarding handguns. *See, e.g.*, *What is Open Carry and Which States Allow It?*, U.S. CONCEALED CARRY (Nov. 14, 2023), https://bit.ly/3uGXAyI (listing majority of states that permit open carry at age 18). In any event, there is nothing to

the Government's argument that *Bruen* and *Heller* invalidated "outlier" laws and therefore a law that is more consistent with the approaches taken by the various states today should not be overturned. Gov't Br. 17. *Bruen* explicitly gave modern legislative judgments about the scope of the Second Amendment right *no weight at all*. It would be bizarre to read the case as permitting the Government to seek shelter from this challenge in contemporary laws, let alone those that it describes at such a high level of generality—after all, New York could just as easily have argued in *Bruen* that it was one of many states that required a permit to carry a firearm. Such considerations were irrelevant there and they are irrelevant here.

Under *Bruen*, this case should be a relatively easy one. The only possible analogues for the Handgun Purchase Ban are from too late a date to overcome the text of the Second Amendment and the unanimous practice at the Founding. *See Bruen*, 597 U.S. at 66 ("As we suggested in *Heller*, however, late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence."). As Judge Jones remarked in *NRA II*:

> Originalism is not without its difficulties in translation to the modern world. For example, deciding whether the use of a thermal heat imaging device violates the original public meaning of the Fourth Amendment is a hard question. In this case, however, the answer to the historical question is easy. The original public meaning of the Second Amendment include[s] individuals eighteen to twenty[.] . . . The members of the first Congress were ignorant of thermal heat imaging devices; with late teenage males, they were familiar.

40

714 F.3d at 342 (Jones, J., dissental) (internal citation omitted). The *Bruen* court largely echoed this sentiment, noting that the inquiry it was prescribing "will be fairly straightforward" in cases where "a challenged regulation addresses a general societal problem that has persisted since the 18th century" and a "lack of a distinctly similar historical regulation addressing that problem [provides] relevant evidence that the challenged regulation is inconsistent with the Second Amendment." 597 U.S. at 26–27. The Government has singled out 18-to-20-year-olds for differential treatment from other adults, seemingly out of a concern that they are too young to be trusted with the right to purchase and possess a firearm. Yet the Founders knew all about 18-to-20-year-olds; they required them to possess firearms in good working order and to know how to use them so that they could be ready to serve as members of the militia if the need arose. They never enacted a *single* "distinctly similar" ban on their acquiring firearms.

### III.    The District Court Did Not Err in Enjoining the Handgun Purchase Ban.

The Government argues that the district court should not have granted injunctive relief because it did not analyze each of the injunction factors in its decision. Gov't Br. 23–24. This was, at worst, harmless error, and it certainly provides no basis for overturning the district court's decision to grant Plaintiffs a declaratory judgment. While the district court did not analyze the issue in its initial opinion, it did examine the injunction factors in reviewing the Government's request

41

for a stay of the injunction and in that opinion it made findings that support its

decision granting the injunction in the first place.

> To be granted an injunction, Plaintiffs must demonstrate:
>
> (1) that [they have] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010). It is well-

recognized that "injunctions prohibiting the enforcement of unconstitutional laws

are the proper remedy when, as here, a court upholds a facial constitutional

challenge." *Fraser v. BATFE*, 2023 WL 5617899, at *5–*6 (E.D. Va. Aug. 30,

2023). In its opinion regarding the stay, the district court explained that plaintiffs

"will clearly be substantially injured" by permitting the enforcement of a law that

violates their constitutional rights, and "upholding constitutional rights is in the

public interest." JA76 (second quote quoting *Legend Night Club v. Miller*, 637 F.3d

291, 303 (4th Cir. 2011)); *see also Ezell*, 651 F.3d at 699 (finding that the Second

Amendment protects "intangible and unquantifiable interests" so infringement of the

right is irreparable harm); *Jones*, 34 F.4th at 732. Meanwhile, it held that the

Government "cannot show irreparable harm by losing their right to enforce an

unconstitutional law" so that "removing the unconstitutional barrier of purchasing

handguns by law-abiding 18-to-20-year-olds does not greatly impact public safety."

JA74–75. Indeed, the only factor which the district court did not specifically address in its stay opinion is the availability of monetary damages, and there the point is obvious: "nothing in the record would permit a finding that an award of money damage[s] could redress that deprivation of the rights enjoyed by the Plaintiffs under the Second Amendment." *Fraser*, 2023 WL 5617899, at *5. The Government is immune from damages in a case like this one, so because the Plaintiffs have shown the Handgun Purchase Ban violates their constitutional rights, the district court was right to enjoin defendants from enforcing it.

## CONCLUSION

This Court should affirm the judgment of the district court and the award of declaratory and injunctive relief.

## REQUEST FOR ORAL ARGUMENT

The Court has tentatively calendared this case for oral argument during the May 7–10 argument session. *See* Order, Doc. 29 (Jan. 30, 2024). Plaintiffs believe oral argument is appropriate and will aid the Court in deciding this case.

Dated: February 21, 2024                Respectfully submitted,

                                        /s/David H. Thompson
                                        David H. Thompson
Adam J. Kraut                           Peter A. Patterson
SECOND AMENDMENT FOUNDATION             William V. Bergstrom
12500 N.E. 10th Place                   COOPER & KIRK, PLLC
Bellevue, WA 98005                      1523 New Hampshire Ave NW
(800) 426-4302                          Washington, DC 20036
akraut@saf.org                          Tel: (202) 220-9600
                                        Fax: (202) 220-9601
                                        dthompson@cooperkirk.com

        *Counsel for Plaintiffs-Appellees*

                                    44

## CERTIFICATE OF COMPLIANCE

This brief complies with the length limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 10,883 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14 point font.

Dated: February 21, 2024

/s/ David H. Thompson
David H. Thompson
*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on February 21, 2024, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system, which will transmit the foregoing document via email to all counsel of record.

Dated: February 21, 2024

/s/David H. Thompson
David H. Thompson
*Counsel for Plaintiffs-Appellees*