No. 23-2275

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

───────────

STEVEN ROBERT BROWN, et al.,

Plaintiffs-Appellees,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, et al.,

Defendants-Appellants.

───────────

On Appeal from the United States District Court
for the Northern District of West Virginia

───────────

**REPLY BRIEF FOR APPELLANTS**

───────────

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney
General*

WILLIAM J. IHLENFELD, II
*United States Attorney*

MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT
STEVEN H. HAZEL
*Attorneys, Appellate Staff
Civil Division, Room 7217
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 514-2498*

## TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................... 1

ARGUMENT ................................................................................................................ 3

The Federal Restrictions on the Sale of Handguns to 18-to-20-Year-Olds Are
    Consistent with the Second Amendment ................................................................ 3

CONCLUSION .......................................................................................................... 18

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                                    **Page(s)**

*Aymette v. State,*
   21 Tenn. (2 Hum.) 154 (1840) ...................................................................... 15

*Bianchi v. Brown,*
   111 F.4th 438 (4th Cir. 2024)........................................................ 2, 11, 13, 15

*Crawford v. Washington,*
   541 U.S. 36 (2004) ...................................................................................... 12

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) .............................................. 2, 4, 7, 8, 8-9, 11, 12, 13, 15

*Hirschfeld v. ATF,*
   5 F.4th 407 (4th Cir. 2021) ........................................................................ 8

*Lara v. Commissioner Pennsylvania State Police*:
   91 F.4th 122 (3d Cir. 2024) ................................................................ 16, 17
   97 F.4th 156 (2024) .................................................................................. 16

*Maryland Shall Issue, Inc. v. Moore,*
   116 F.4th 211 (4th Cir. 2024)..................................................................... 8

*McDonald v. City of Chicago,*
   561 U.S. 742 (2010) ............................................................................ 8, 13

*Monsanto Co. v. Geertson Seed Farms,*
   561 U.S. 139 (2010) .................................................................................. 17

*National Rifle Ass'n of Am. v. ATF,*
   700 F.3d 185 (5th Cir. 2012) ............................................................... 1, 5, 9

*New York State Rifle & Pistol Ass'n v. Bruen,*
   597 U.S. 1 (2022) ....................................................... 8, 11, 12, 13, 14

*Opinion of the Justices, In re,*
   39 Mass. (22 Pick) 571 (1838) ................................................................. 9

*Paris v. Lara,*
   No. 24-93, 2024 WL 4486348 (U.S. Oct. 15, 2024) ................................. 16

*Ramos v. Louisiana,*
   590 U.S. 83 (2020) .................................................................................. 12

*Rocky Mountain Gun Owners v. Polis*,
  No. 23-1251, 2024 WL 4677573 (10th Cir. Nov. 5, 2024) .................................... 4, 8

*Roth v. United States*,
  354 U.S. 476 (1957) ..................................................................... 12

*State v. Callicutt*,
  69 Tenn. 714 (1878) .................................................................... 15

*United States v. Alvarez*,
  567 U.S. 709 (2012) ..................................................................... 12

*United States v. Price*,
  111 F.4th 392 (4th Cir. 2024) .......................................................... 6

*United States v. Rahimi*,
  144 S. Ct. 1889 (2024) .................................... 1, 2, 4, 6-7, 7, 8, 11, 12, 14, 16

*United States v. Rene E.*,
  583 F.3d 8 (1st Cir. 2009) ............................................................. 6

*Worth v. Jacobson*,
  108 F.4th 677 (8th Cir. 2024) ........................................................ 16, 17

*Wudi Indus. (Shanghai) Co. v. Wong*,
  70 F.4th 183 (4th Cir. 2023) .......................................................... 17

## U.S. Constitution:

Art. I, § 2, cl. 2 ......................................................................... 3

## Statutes:

Militia Act
  ch. 33, § 1, 1 Stat. 271, 272 (1792) ................................................... 9

21 U.S.C. § 387f(d)(3)(A)(ii) ............................................................. 5

Miss. Code Ann. § 1-3-27 ................................................................. 4

**Legislative Material:**

2 *Annals of Cong.* 1808 (1790) .................................................. 10

Act of Feb. 27, 1875,
    ch. 40, § 1, 1875 Ind. Acts 59, 59 .................................... 5

Act of Mar. 24, 1882,
    ch. 135, § 1, 1882 W. Va. Acts 421, 421-22 .................... 5

Act of Mar. 14, 1890,
    ch. 73, § 97, 1890 Wyo. Sess. Laws 127, 140 ................ 5

**Other Authorities:**

John Faucheraud Grimké, *The South-Carolina Justice of Peace*
    (R. Aitken & Son eds., 1788) ............................................ 11

Randolph Roth, *Why Guns Are and Are Not the Problem:*
    *The Relationship Between Guns and Homicide in American*
    *History, in A Right to Bear Arms?: The Contested Role of*
    *History in Contemporary Debates on the Second Amendment*
    (Jennifer Tucker et al. eds. 2019) .................................... 7

*The Code of Tennessee*, pt. IV, tit. 1, ch. 9, art. II, § 4864
    (Return J. Meigs & William F. Cooper eds., 1858) .................... 15

Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*,
    11 Tex. Rev. L. & Pol'y 191 (2006) ................................ 14

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs urge that the age restrictions codified at Section 922(b)(1) and (c) of Title 18 defy historical tradition and strike at the heart of Second Amendment protections. At times they appear to argue (*see* Pls.' Br. 16) that any age limit on the purchase of handguns would contravene the Second Amendment. At other times they urge (Pls.' Br. 29) that an age requirement for handgun purchases can be no higher than the requirement for activities unrelated to firearms; thus, an age limit of 21 would have been valid when the statute was enacted in 1968 but became invalid at some unspecified point later as states lowered the age of majority for certain activities that do not involve access to deadly weapons.

Plaintiffs themselves appear to recognize that their first proposition is implausible. And their second proposition accords with neither common sense nor the history on which plaintiffs seek to rely. As our opening brief explained, legislatures at the time of the founding established an age qualification of 21 for a variety of activities, and plaintiffs do not dispute that contemporaries regarded under-21-year-olds as "infants" generally subject to parental supervision. *National Rifle Ass'n of Am. v. ATF (NRA)*, 700 F.3d 185, 201 (5th Cir. 2012). The provisions at issue here thus accord "with the principles that underpin our regulatory tradition." *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024). The provisions do not prevent plaintiffs from purchasing firearms other than handguns. Nor do they prevent plaintiffs from possessing handguns. The provisions do no more than empower parents to

determine whether it is appropriate for their children under the age of 21 to obtain handguns.

That the Second Amendment does not strip legislatures of authority to limit the sale of handguns to under-21-year-olds is confirmed by nineteenth century evidence. As this Court recently observed, "[i]n the mid-19th century" "[i]mprovements in weapons technology" made handguns more common and more lethal. *Bianchi v. Brown*, 111 F.4th 438, 464-66 (4th Cir. 2024) (en banc). In the wake of those changes, at least 20 jurisdictions enacted laws prohibiting the sale of handguns to individuals under the age of 21. Plaintiffs do not identify any historical court, commentator, or legislature to have called the constitutionality of those prohibitions into question. Instead, plaintiffs urge (Pls.' Br. 32) that nineteenth century evidence should be given little or no weight. But the Supreme Court has hailed such evidence as "a critical tool of constitutional interpretation," *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008), and has routinely reviewed it in cases concerning the Second Amendment and various other constitutional provisions, *see Rahimi*, 144 S. Ct. at 1916-19 (Kavanaugh, J., concurring) (collecting dozens of examples). Plaintiffs' alternative argument, which involves a highly selective account of nineteenth century laws, mirrors the rigid historical approach followed by the *Rahimi*'s lone dissenter but repudiated by the Court. *See id.* at 1903 (majority opinion).

## ARGUMENT

## The Federal Restrictions on the Sale of Handguns to 18-to-20-Year-Olds Are Consistent with the Second Amendment

As our opening brief explained, two principles emerge from the Founding Era evidence. First, legislatures established an age qualification of 21 for various activities, and there is no evidence that they were viewed as lacking authority to impose the same qualification on the purchase of handguns. *See* Opening Br. 10-12. Second, the founders regarded under-21-year-olds as "infants" generally subject to parental supervision. *See id.* at 10-15. These principles are consistent with the provisions at issue here, which Congress enacted to limit 18-to-20-year-olds' ability to obtain handguns without their parents' approval.

**A.** Plaintiffs offer a variety of theories for their contrary view, the most extreme of which is a claim that no age restrictions are permissible. Plaintiffs note that "the Constitution elsewhere explicitly considers and prescribes limits based on age. *See, e.g.*, U.S. Const. art. I, § 2, cl. 2 (must be 25 years old to serve in the House of Representatives)." Pls.' Br. 16. From this, plaintiffs conclude that "the Founders considered age and knew how to set age requirements but placed no such restrictions on . . . the Second Amendment." Pls.' Br. 16 (citation omitted). This categorical theory would cast doubt on *any* age-related firearm restriction; the Court should reject this level of absolute ahistoricism.

Plaintiffs' other arguments likewise give short shrift to relevant historical evidence. Plaintiffs' alternative textual contention is that *District of Columbia v. Heller*, 554 U.S. 570 (2008), described the "people" covered by the Second Amendment as "all Americans," Pls.' Br. 8 (quoting *Heller*, 554 U.S. at 580-81), and that, inasmuch as 18-to-20-year-olds are "adults today," they cannot be subject to age restrictions, Pls.' Br. 29 (emphasis omitted). Under this theory, the federal restrictions were constitutional upon their enactment in 1968—when 21 remained the age of majority for most purposes in most states—and would become constitutional again if states return to that approach. Indeed, plaintiffs' position appears to dictate that the federal restrictions are still permissible in those states that retain 21 as the age of majority. *See, e.g.*, Miss. Code Ann. § 1-3-27.

Nothing in the Supreme Court's cases justifies plaintiffs' uncertain and unstable understanding of the Second Amendment. There is no plausible historical "principle[]" that would require legislatures to establish identical age qualifications for access to arms as for activities that do not involve deadly weapons. *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2004). As the Tenth Circuit recently observed in rejecting a Second Amendment challenge to a state law prohibiting the sale of firearms to under-21-year-olds, "the Constitution does not establish a one-age-fits-all standard for all rights." *Rocky Mountain Gun Owners v. Polis*, No. 23-1251, 2024 WL 4677573, at *14 (10th Cir. Nov. 5, 2024). And plaintiffs identify no evidence that the founders or their descendants viewed legislative authority to restrict access to arms by

4

18-to-20-year-olds as contingent on their status as minors.  To the contrary, a number of historical age qualifications described the class of regulated individuals by reference to their age, without regard to their designation as minors for other purposes.[1]

In any event, the modern practices on which plaintiffs seek to rely confirm that legislatures retain authority to establish an age qualification of 21.  Legislatures continue to set 21 as the age requirement for many activities, including purchasing alcohol, *see NRA*, 700 F.3d 185, 204 n.17 (5th Cir. 2012), lottery tickets, *see id.*, tobacco products, 21 U.S.C. § 387f(d)(3)(A)(ii), and—particularly relevant here— handguns.  Although plaintiffs assert (Pls.' Br. 39) that "most states recognize 18-year-olds as having full rights regarding handguns," that is inaccurate.  As multiple states have explained in a related Second Amendment case, a substantial majority of states have enacted laws restricting the possession or purchase of arms by 18-to-20-year-olds.  *See* States' Amicus Br. at 9-13, *McCoy v. ATF*, No. 23-2085 (4th Cir. Dec. 28, 2023) (collecting citations).  The age qualifications at issue here thus fall within the range accepted by historical and modern legislatures alike.

The extent of plaintiffs' error is illustrated by their emphasis on other constitutional protections that apply to minors.  Plaintiffs assert that the First and Fourth Amendments "extend to 18-year-olds and in fact extend to *the whole people*,

---

[1] *See, e.g.*, Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Acts 59, 59; Act of Mar. 24, 1882, ch. 135, § 1, 1882 W. Va. Acts 421, 421-22; Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Sess. Laws 127, 140.

even those under 18," and argue that the Second Amendment must apply on the same terms.  Pls.' Br. 16.  But the Supreme Court's historical inquiry in Second Amendment cases reflects concerns distinct from those involved in the application of First and Fourth Amendment protections.  *See United States v. Price*, 111 F.4th 392, 401 (4th Cir. 2024) (en banc) (explaining that "we can *only* properly" interpret the Second Amendment's text "by looking to the historical scope of the Second Amendment right").  And in any case, were plaintiffs' attempt to equate the relevant standards correct, their logic would dictate not that the particular age restrictions at issue here are impermissible, but that no age restrictions of any kind are permissible.  Plaintiffs themselves appear to concede that such a result would be "absurd."  Pls.' Br. 39; *see also United States v. Rene E.*, 583 F.3d 8, 15-16 (1st Cir. 2009) (upholding, based on a review of history and tradition, the federal prohibition on the possession of handguns by individuals under the age of 18).

**B.**  Plaintiffs also misunderstand the nature of the historical evidence germane to the Second Amendment analysis.  That is particularly clear in their suggestion (Pls.' Br. 6, 21, 41) that modern age qualifications satisfy the Second Amendment only if Founding Era legislatures adopted parallel laws.  The Supreme Court has not reduced the interpretation of the Second Amendment to a rote archival search for historical laws that match a modern statute.  To the contrary, *Rahimi* explained that "the appropriate analysis involves considering whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition."  144 S. Ct. at 1898

6

(emphasis added).  The Court accordingly recognized that the Second Amendment permits modern laws that are "by no means identical" to historical precursors.  *Id.* at 1901.  As Justice Barrett emphasized in concurrence, "a test that demands overly specific analogues" would create "serious problems," including "forc[ing] 21st-century regulations to follow late-18th-century policy choices" and "assum[ing] that founding-era legislatures maximally exercised their power to regulate."  *Id.* at 1925 (Barrett, J., concurring).

There is no evidence that any Founding Era legislature declined to establish age qualifications for the commercial sale of handguns because of the Second Amendment or the principles it embodies.  Legislatures had little reason to adopt such qualifications given the cumbersome nature and relative rarity of handguns at the founding.  *See* Randolph Roth, *Why Guns Are and Are Not the Problem: The Relationship Between Guns and Homicide in American History*, *in A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 113, 116-18 (Jennifer Tucker et al. eds. 2019).  Other forms of historical evidence—including legislatures' adoption of age qualifications for other activities, parents' authority to supervise under-21-year-olds, and laws enacted after handguns grew more common and more deadly—therefore assume heightened importance.

As our opening brief showed, that evidence is consistent with the Supreme Court's refusal to cast doubt on "laws imposing conditions and qualifications on the commercial sale of arms."  *Heller*, 554 U.S. at 626-27.  A plurality of the Court

7

repeated that statement in *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010); Justice Kavanaugh and the Chief Justice reiterated the point in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 81 (2022) (Kavanaugh, J., joined by Roberts, C.J., concurring); and *Rahimi* again emphasized that *Heller* identified this and other categories of firearms regulations as "presumptively lawful," 144 S. Ct. at 1902 (quoting *Heller*, 554 U.S. at 626-27). This Court "routinely afford[s] substantial, if not controlling deference" to those statements. *Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211, 222 (4th Cir. 2024) (en banc) (explaining, by way of example, that the Court has "relied on [similar] dictum from *Heller* in rejecting myriad constitutional challenges to laws prohibiting the possession of firearms by felons"). Applying these Supreme Court precedents, the Tenth Circuit recently recognized that laws imposing "a minimum age of 21" for purchasing firearms generally pass constitutional muster. *Polis*, 2024 WL 4677573, at *23. Plaintiffs' primary response to these authorities (Pls.' Br. 14) is to invoke the vacated panel decision in *Hirschfeld v. ATF*, 5 F.4th 407 (4th Cir. 2021), which relied on premises at odds with *Rahimi* and with this Court's en banc decisions.

In response to the extensive discussion of Founding Era evidence in our opening brief, plaintiffs focus (Pls.' Br. 18-23) on selected features of historical militia practice. That approach is incompatible with *Heller*'s statement that the Second Amendment codifies "an individual right unconnected with militia service." 554 U.S.

at 582. Consistent with that statement, the Supreme Court's Second Amendment decisions—including *Heller*, *Bruen*, and *Rahimi*—do not rely on militia laws.

At any rate, plaintiffs' focus on militia laws fails on its own terms. Plaintiffs suggest (Pls.' Br. 21) that some colonial militias included individuals as young as 16, and that those individuals were therefore entitled to obtain handguns outside the context of militia service. But serving in a militia involves access to arms in a supervised setting. Permitting a 16-year-old to drill with a musket under the oversight of militia officers does not imply that the same individual would have a right to obtain a handgun outside that context and without parental approval. For similar reasons, plaintiffs' claim (Pls.' Br. 20) that certain historical figures believed that 18-year-olds could make good soldiers when subject to military discipline does not reflect a judgment that those individuals would be constitutionally entitled to acquire lethal weapons in the absence of supervision.

To the extent that militia laws are relevant to the inquiry here, they underscore legislatures' authority to set age qualifications for access to arms. Plaintiffs insist (Pls.' Br. 19) that the Militia Act of 1792 required states to admit 18-to-20-year-olds into the militia. In fact, however, the Act "gave States discretion to impose age qualifications on service." *NRA*, 700 F.3d at 204 n.17 (citing Militia Act ch. 33, § 1, 1 Stat. 271, 272 (1792)). A leading judicial decision of the time confirms that the Act allowed legislatures "to exempt from enrol[l]ment in the militia, all persons under twenty-one." *In re Opinion of the Justices*, 39 Mass. (22 Pick) 571, 576 (1838). And on multiple

9

occasions, states exercised their authority to exclude 18-to-20-year-olds from militia service. Plaintiffs do not meaningfully engage with the examples from Georgia, New Jersey, North Carolina, and Virginia discussed in our opening brief. Opening Br. 18-19 & 19 nn.3-4.

Plaintiffs likewise fail to grapple with evidence that 18-to-20-year-olds serving in Founding Era militias generally depended on their parents for access to firearms. For example, many state legislatures directed parents to supply weapons for their children's militia duty. *See* Opening Br. 19-20, 20 n.5 (collecting citations from Maine, Massachusetts, Missouri, New Hampshire, North Carolina, and Vermont). And when Congress considered whether the federal government should furnish firearms to persons unable to equip themselves, Representative John Vining asked "by what means minors were to provide themselves with the requisite articles?" 2 *Annals of Cong.* 1808 (1790). The remedy, according to Representative Jeremiah Wadsworth, was that "as to minors, their parents or guardians would prefer furnishing them with arms themselves." *Id.* at 1809. The Second Amendment's ratifiers thus presumed that 18-to-20-year-olds could not acquire firearms without their parents' support.

For the same reasons that militia laws do not help plaintiffs, neither do historical policing practices. According to plaintiffs (Pls.' Br. 27), under-21-year-olds sometimes participated in ad hoc law enforcement efforts such as the "hue and cry"—a scenario in which everyday citizens assisted in the pursuit of fleeing criminals. An influential Founding Era treatise makes clear, however, that individuals under the

age of 21 had no entitlement to participate in similar policing practices and were often excluded from them.  *See* John Faucheraud Grimké, *The South-Carolina Justice of Peace* 117-18 (R. Aitken & Son eds., 1788).  Regardless, any duty to participate in emergency law enforcement efforts (which would rarely have involved the use of handguns, given their many limitations, *see supra* p. 7) would not imply a right to access handguns outside that narrow context.

**C.** Evidence from the nineteenth century demonstrates the same understanding.  Plaintiffs do not dispute that in the decades surrounding the Fourteenth Amendment's passage, at least 20 jurisdictions prohibited the commercial sale of handguns to 18-to-20-year-olds.  *See* Opening Br. 13-17.  Nor do plaintiffs suggest that any historical legislature, court, or commentator called the constitutionality of those prohibitions into question.  Instead, plaintiffs urge (Pls.' Br. 32) that nineteenth century evidence is to be given little or no weight.

**1.** The Supreme Court has explained, however, that nineteenth century materials constitute a "critical tool of constitutional interpretation."  *Bruen*, 597 U.S. at 20, 36 (quoting *Heller*, 554 U.S. at 605, 614); *see also Rahimi*, 144 S. Ct. at 1917 (Kavanaugh, J., concurring) (emphasizing that "post-ratification history" represents "a proper tool to discern constitutional meaning"); *id.* at 1924 (Barrett, J., concurring) (recognizing that "postenactment history can be an important tool").  The Court's extensive review of nineteenth century evidence in both *Heller* and *Bruen* confirms that

11

such evidence plays an important role in the Second Amendment analysis. *See Heller*, 554 U.S. at 605-19; *Bruen*, 597 U.S. at 30, 35-36, 50-56.

As Justice Kavanaugh emphasized in his *Rahimi* concurrence, "the Framers themselves intended that post-ratification history would shed light on the meaning of vague constitutional text." 144 S. Ct. at 1917. "Reliance on post-ratification history" has thus "shaped scores of Court cases spanning all domains of constitutional law, every era of the nation's history, and Justices of every stripe." *Id.* at 1918 (quotation marks omitted). In analyzing the First Amendment, for example, the Court has reviewed nineteenth century sources in discussing "historic and traditional" exceptions to the free speech right. *United States v. Alvarez*, 567 U.S. 709, 717 (2012) (plurality opinion) (quotation marks omitted); *see, e.g.*, *Roth v. United States*, 354 U.S. 476, 483-85, 483 n.13, 485 n.17 (1957) (citing nineteenth century laws in determining whether obscenity is protected by First Amendment). In Sixth Amendment cases, the Court has likewise consulted nineteenth century evidence. *See Ramos v. Louisiana*, 590 U.S. 83, 91-92 (2020) (citing evidence from "throughout the 19th century" in addressing the right to a jury trial); *Crawford v. Washington*, 541 U.S. 36, 49-50 (2004) (citing mid-nineteenth-century materials in defining the Confrontation Clause's scope). There is no basis for adopting a more circumscribed view of the relevant historical evidence in Second Amendment cases.

Moreover, the Supreme Court has recognized that the Second Amendment codified a "pre-existing right" regarded as "venerable" when the Amendment was

ratified in 1791, *Heller*, 554 U.S. at 603, 605, and "still recognized to be fundamental" in the mid-to-late nineteenth century, *McDonald*, 561 U.S. at 773.  Sources from both before and after 1791 thus provide insight into what the right to bear arms entails. Nineteenth-century history warrants particular weight because the Supreme Court has determined that the firearms rights protected by the Second Amendment and the Fourteenth Amendment "have the same scope." *Bruen*, 597 U.S. at 37.  Tracing the meaning of a right codified in 1791 and renewed in 1868 requires a review of sources from both periods.  Indeed, *Bruen* recognizes that "a regular course of practice" arising after those periods "can liquidate [and] settle the meaning of disputed or indeterminate terms" in the Constitution.  *Id.* at 35-36 (quotation marks omitted).

That nineteenth century evidence informs the relevant analysis is illustrated by this Court's recent en banc decision in *Bianchi*, where the Court explained that in "the mid-19th century" "[i]mprovements in weapons technology" precipitated a "rise in interpersonal violence" to which legislatures responded by enacting many firearms regulations.  111 F.4th at 465-66.  This Court relied in significant part on those nineteenth century regulations in upholding the modern law at issue in *Bianchi*. Evidence from the same period likewise plays an important role here.

**2.** Plaintiffs' other grounds for ignoring nineteenth century evidence are similarly flawed.  Plaintiffs offer a highly selective account of that evidence (Pls.' Br. 33-39) that addresses various historical laws in isolation and attempts to identify different reasons each law should be disregarded.  That mirrors the piecemeal

13

approach followed by *Rahimi*'s lone dissenter but rejected by the Court, which derived

principles by looking to historical laws when "[t]aken together."  144 S. Ct. 1901.

    In any event, plaintiffs' historical account fails on its own terms.  For example,

plaintiffs mistakenly urge (Pls.' Br. 34-35) this Court to discount the significance of

laws from two regions, the South and West.  Although plaintiffs suggest that racism

motivated Southern firearms laws, they present no evidence that was true of

restrictions on 18-to-20-year-olds' access to arms.  And although plaintiffs claim that

*Bruen* disregarded laws from jurisdictions in the West, the Supreme Court did so only

for certain territorial laws that covered "miniscule" populations and that lacked

parallels in other parts of the country.  597 U.S. at 67.  Neither consideration carries

force here, where laws passed in the West mirrored those enacted in many of the

most populated areas of the East, Midwest, and South.

    Plaintiffs would also have this Court disregard (Pls.' Br. 35) laws from states

without Second Amendment analogues in their state constitutions.  As an initial

matter, plaintiffs miss the mark because similar laws proliferated in many states whose

constitutions *did* contain Second Amendment analogues.  *See, e.g.*, Eugene Volokh,

*State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol'y 191, 208-16

(2006) (reflecting that the constitutions of Alabama, Georgia, Indiana, Kansas,

Mississippi, Missouri, North Carolina, Tennessee, and Wyoming incorporated a right

to bear arms at the time those states enacted age-based firearms regulations).  In any

event, plaintiffs offer no evidence that any historical prohibition on the purchase of

14

firearms by 18-to-20-year-olds was enacted because of the absence of a state constitutional provision securing the right to bear arms.

It is likewise error for plaintiffs to dismiss evidence from nineteenth century courts and commentators. Plaintiffs contend (Pls.' Br. 38-39) that Thomas Cooley's "massively popular" treatise, *Heller*, 554 U.S. at 616, cited a Tennessee Supreme Court decision upholding age-based firearms regulations without necessarily endorsing that conclusion, but the point is that Cooley understood the decision as accurately summarizing the law at the time. And plaintiffs' claim that the decision Cooley cited has no application here because it supposedly addressed a law restricting the "concealed carry of dangerous weapons, not the right to keep and bear arms" is wrong. Pls.' Br. 38 (quotation marks omitted). The relevant law generally barred providing "to any minor a pistol[] . . . or like dangerous weapon," *The Code of Tennessee*, pt. IV, tit. 1, ch. 9, art. II, § 4864, at 871 (Return J. Meigs & William F. Cooper eds., 1858), and the state's highest court did not interpret the law in the limited way plaintiffs suggest, *see State v. Callicutt*, 69 Tenn. 714 (1878). No more successful is plaintiffs' claim that the Tennessee Supreme Court misunderstood the constitutional right to bear arms. Indeed, this Court recently cited a nineteenth century decision from the same state court as evidence illuminating the Second Amendment's scope, *see Bianchi*, 111 F.4th at 468 (discussing *Aymette v. State*, 21 Tenn. (2 Hum.) 154 (1840)).

Plaintiffs' misunderstanding of the Supreme Court's historical test is also apparent in their suggestion (Pls.' Br. 33) that nineteenth century laws should be

disregarded unless they were enacted by "a majority" of states. *Rahimi* does not adopt any such test and instead requires a holistic review of relevant historical evidence. *See* 144 S. Ct. at 1901. This is not a situation in which some historical legislatures adopted a firearms restriction but many others refrained from doing so because of constitutional concerns. Instead, age qualifications were enacted by at least 20 jurisdictions, remained on the books for years, and were not cast into doubt by any legislature, court, or commentator. Nineteenth century evidence thus overwhelmingly supports the provisions of federal law at issue here.

For these reasons, plaintiffs' reliance (Pls.' Br. 13, 24, 32) on *Lara v. Commissioner Pennsylvania State Police*, 91 F.4th 122 (3d Cir. 2024), and *Worth v. Jacobson*, 108 F.4th 677 (8th Cir. 2024) is misplaced. In *Lara*, a divided panel of the Third Circuit acknowledged the "catalogue" of age-based firearms laws enacted in the nineteenth century but erroneously "set aside" that evidence and refused to consider it, instead placing conclusive weight on Founding Era militia laws. *See Lara*, 91 F.4th at 134-36. That approach is incorrect for the reasons discussed above and as explained by the panel dissent and the dissent from the denial of rehearing en banc. *See id.* at 145-47 (Restrepo, J., dissenting); *Lara*, 97 F.4th at 161-62 (Krause, J., dissenting sur denial of rehearing en banc). The Supreme Court recently granted certiorari in *Lara*, vacated the panel's decision, and remanded for further consideration in light of *Rahimi. See Paris v. Lara*, No. 24-93, 2024 WL 4486348 (U.S. Oct. 15, 2024). Similarly, in *Worth*, the Eighth Circuit acknowledged the numerous age qualifications enacted in the nineteenth

16

century, but erroneously discounted that evidence and demanded an overly specific historical analogue, contrary to *Rahimi*. *See Worth*, 108 F.4th at 696-97. In all events, both *Lara* and *Worth* involved state laws that prohibited the public carrying of firearms by 18-to-20-year-olds, rather than restricting only firearms sales to that age group. *See Lara*, 91 F.4th at 126; *Worth*, 108 F.4th at 683. The Eighth Circuit recognized the numerous nineteenth century laws addressing "the *sale* or *furnishing* of weapons to minors," which the Court distinguished from the public-carry restriction at issue in that case. *Worth*, 108 F.4th at 697.

**D.** Plaintiffs also err in defending the district court's award of injunctive relief. Plaintiffs do not dispute that a district court may enter an injunction only when it "determine[s] that an injunction *should* issue under the traditional four-factor test." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157-58 (2010). Plaintiffs also do not dispute that the district court failed to apply that test. Plaintiffs claim (Pls.' Br. 42-43), however, that this failure should be excused because the court did apply the appropriate test when granting the government's motion to stay the injunction pending appeal. But whether to enter a stay during appellate proceedings and whether to award a permanent injunction are different questions that implicate distinct equitable considerations. Because the district court did not apply the governing test, the injunction cannot withstand appellate review. *See Wudi Indus. (Shanghai) Co. v. Wong*, 70 F.4th 183, 192-93 (4th Cir. 2023).

17

## CONCLUSION

For the reasons given above and in our other filings, the judgment of the
district court should be reversed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney
General*

WILLIAM J. IHLENFELD, II
*United States Attorney*

MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT

*s/ Steven H. Hazel*
STEVEN H. HAZEL
*Attorneys, Appellate Staff
Civil Division, Room 7217
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 514-2498
Steven.H.Hazel@usdoj.gov*

November 2024

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 4,320 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Steven H. Hazel*
Steven H. Hazel

## CERTIFICATE OF SERVICE

I hereby certify that on November 7, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Steven H. Hazel*

Steven H. Hazel